Ellen L. RAY and William H. Schaap, Appellants,

v.

Stansfield TURNER, Director Central Intelligence Agency.

No. 77–1401.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1978.

Decided Aug. 24, 1978.

As Amended Aug. 25, 1978.

As Amended Nov. 15, 1978.

James E. Drew, Washington, D. C., for appellants.

Michael F. Hertz, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Morton Hollander and Leonard Schaitman, Asst. U. S. Attys., Washington, D. C., were on the brief, for

appellee. Harry R. Silver and William Kanter, Attys., U. S. Dept. of Justice, Washington, D. C., also entered appearances for appellee.

Ira M. Lowe and Martin S. Echter, Washington, D. C., were on the brief for amicus curiae Baez, Hayden and Fonda.

Before WRIGHT, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

Opinion Per Curiam.

Opinion filed by WRIGHT, Chief Judge, concurring in the remand.

PER CURIAM:

This appeal presents the question whether the district court erred in dismissing a lawsuit under the Freedom of Information Act (FOIA) upon the basis of affidavits supplied by an official of the Central Intelligence Agency (CIA). We find there was error and remand.

## I. PROCEDURAL BACKGROUND OF LITIGATION.

Plaintiffs (appellants) Ellen Ray and William Schaap sent identical letters to the CIA requesting "a copy of any file you may have on me." The CIA replied that while it did not have files on plaintiffs, there were documents in CIA files that referred to plaintiffs. The CIA refused to release those documents, and after administrative appeals were exhausted, plaintiffs brought this action under the FOIA. The CIA subsequently released portions of the withheld documents, and the government then moved for summary judgment, relying principally on affidavits of one Eloise Page. The critical affidavit, set out in the appendix, purports to describe the documents at issue and the grounds for the government's claims of exemption.[1]

The district court granted the government's motion for summary judgment and denied plaintiffs' motion for *in camera* inspection.[2] It found that the withheld documents were exempt from disclosure under the FOIA on the basis of Exemption 1 alone, Exemption 3 alone, or the two exemptions coupled together. As to Exemption 1, 5 U.S.C. § 552(b)(1),[3] the court found that the affidavit showed that the documents were properly classified under Executive Order 11,652, 3 C.F.R. 339 (1974). As to Exemption 3, 5 U.S.C. § 552(b)(3),[4] the court found that the affidavits stated that the release of the information could reasonably be expected to reveal intelligence sources and methods as well as organizational data, and that 50 U.S.C. §§ 403(d)(3), 403g justified the CIA invocation of Exemption 3.

In a key passage, the district court's opinion stressed that "there has been no credible challenge to the veracity of these averments [in the affidavits] and nothing appears to raise the issue of bad faith." In denying *in camera* inspection, the district court relied on *Weissman v. CIA*, 184 U.S. App.D.C. 117, 565 F.2d 692 (1977). Specifically, the court found with respect to Exemption 1 that

1. The affidavit states that document 1 has been provided to plaintiffs with only minor deletions that include location of CIA overseas installations, cryptonyms [words used as a substitute for the identity of a person or activity], a pseudonym and CIA organizational data. Plaintiffs do not appeal from the district court's refusal to order the CIA to release the remainder of document 1. This appeal involves documents 2–10.

2. Memorandum Opinion, filed January 25, 1977, Appendix at 65.

3. 5 U.S.C. § 552(b)(1) (1976) provides:
   (b) This section does not apply to matters that are—
   (1)(A) specifically authorized under criteria established by an Executive order to be kept

secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order
. . . .

4. 5 U.S.C. § 552(b)(3) (1976) provides:
   (b) This section does not apply to matters that are—
   \* \* \* \* \* \*
   (3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld . . . .

[t]he affidavits in this record are specific and detailed. The record further indicates that the Agency dealt with plaintiffs' requests in a conscientious manner and released segregable portions of the material. No abuse of discretion has been shown.

Memorandum Opinion at 3.

Regarding Exemption 3, it ruled:

With respect to documents withheld under exemption 3, in camera inspection is seldom, if ever, necessary or appropriate. * * * Exemption 3 differs from other FOIA exemptions in that its applicability does not depend on the factual content of specific documents.

*Id.* at 4.

On appeal, the government insists that the pertinent documents are exempt under Exemption 1 and are also exempt under Exemption 3.[5] Plaintiffs assert that discovery and *in camera* inspection by the district court was required, because documents 2 through 10 contain segregable material that is not exempt, and because neither document 2 nor document 10 is exempt under Exemption 1.

## II. RELEVANT CONSIDERATIONS IN FOIA CASES INVOLVING NATIONAL SECURITY ISSUES.

The FOIA was passed in 1966, as an amendment to the Administrative Procedure Act, in order to increase disclosure of government information to the American people. Agencies were required to disclose all records that did not come within one of nine explicit exemptions specified by Congress.[6] In the event of agency nondisclosure, the Act provided for court review. In any such case, "the court shall determine the matter de novo . . . and the burden is on the agency to sustain its action."[7]

### A. Judicial Interpretations and Legislative Modifications.

In *EPA v. Mink*, 410 U.S. 73, 81–84, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Court considered Exemption 1, which at that time covered matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." 5 U.S.C. § 552(b)(1) (1970). It held that a court should not review the substantive propriety of the classification or go behind an agency affidavit stating that the requested documents had been duly classified pursuant to Executive order.[8] The Court said that "Congress chose to follow the Executive's determination in these matters," and *in camera* inspection to test the propriety of the classification was not authorized. 410 U.S. at 81, 93 S.Ct. at 833.

In 1974 Congress overrode a presidential veto and amended the FOIA for the express

---

**5.** The government acknowledges an exception for two items in document 10 that it claims are exempt under Exemptions 6 and 7(F). On remand, the district court is to make rulings with regard to these exemptions.

**6.** 5 U.S.C. § 552(c) (1976); *EPA v. Mink*, 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

**7.** 5 U.S.C. § 552(a)(3) (1976). Courts were given authority to review de novo any denial of access "in order that the ultimate decision as to the propriety of the agency's action is made by the court and [to] prevent [review] from becoming meaningless judicial sanctioning of agency discretion." S.Rep. No. 813, 89th Cong., 1st Sess. 8 (1965).

**8.** *Mink* involved a request for documents prepared by various government officials for the President in connection with a scheduled nuclear test. The documents were withheld under Exemptions 1 and 5. Those seeking the information had not disputed the government's claim that proper classification procedures had been followed, 410 U.S. at 84, 93 S.Ct. 827, and the Court held that the substantive propriety of the classification had been committed by Congress to Executive discretion. The Court therefore reversed the order of the court of appeals that the district court examine the documents *in camera* and release any segregable nonsecret portions. With regard to Exemption 5 the Court held that a reviewing court should allow an agency the opportunity to prove by detailed affidavits and other evidence that material withheld is exempt before requiring *in camera* inspection. The Court accordingly modified the "unnecessarily rigid" remand ordered by the court of appeals in order to provide the government a chance to meet its burden. *Id.* at 92–93, 93 S.Ct. 827.

purpose of changing this aspect of the *Mink* case.[9] Exemption 1 was modified to exempt only matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (1976).

Furthermore, the 1974 revision changed the FOIA language describing the role of a reviewing court considering *any* claim of exemption. It provided that "the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B) (1976). The Conference Report accompanying the amendments explained that "[w]hile *in camera* examination need not be automatic, in many situations it will plainly be necessary and appropriate." S.Rep. No. 93–1200, 93d Cong., 2d Sess. 9 (1974), U.S.Code Cong. & Admin.News 1974, p. 6287.

Exemption 3 originally exempted matters "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3) (1970). In *FAA Administrator v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), the Court held that a statute could "specifically exempt" matters from disclosure even if the statute gave an agency broad discretion to determine whether the information should be withheld.[10] Concerned about excessive agency discretion, Congress in 1976 passed an amendment to change the result reached in *Robertson*. Exemption 3 now authorizes nondisclosure of matters "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3) (1976).

## B. The Nature of De Novo Review.

### Procedures to be observed

In *Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 484 F.2d 820 (1973) *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), this court sought to cope with the difficulty of providing de novo review of exemptions claimed by the government. It initiated procedures designed to mitigate the administrative burden on the courts and ensure that the burden of justifying claimed exemptions would in fact be borne by the agencies to whom it had been assigned by Congress.

The court took its cue from a portion of the Supreme Court's *Mink* opinion that was not overruled by Congress—the portion discussing how a court should proceed when there is a factual dispute concerning the nature of the materials being withheld.[11] "Expanding" on the Supreme Court's "outline," the court established the following procedures: (1) A requirement that the agency submit a "relatively detailed analysis [of the material withheld] in manageable segments." "[C]onclusory and generalized allegations of exemptions" would no longer be accepted by reviewing courts. 157 U.S. App.D.C. at 346, 484 F.2d at 826. (2) "[A]n indexing system [that] would subdivide the document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification."

---

9. S.Rep. No. 93–1200, 93d Cong., 2d Sess. 11–12 (1974), U.S.Code Cong. & Admin.News 1974, p. 6267; *see* Pub.L. 93–502, §§ 1–3, 88 Stat. 1561 (1974).

10. The statute relied on by the government in *Robertson* empowered the Administrator or the Board of the Federal Aviation Administration, upon written application of "any person", to withhold agency records if "in their judgment, a disclosure of such information would adversely affect the interests of such person and is not required in the interest of the public." 49 U.S.C. § 1504 (1976).

11. *See EPA v. Mink*, 410 U.S. at 92–94, 93 S.Ct. at 838–839. At the time this court decided *Vaughan* Congress had not yet enacted the 1974 amendments to the FOIA, and both aspects of the *Mink* case were still good law.

*Id.* 157 U.S.App.D.C. at 347, 484 F.2d at 827. This index would allow the district court and opposing counsel to locate specific areas of dispute for further examination and would be an indispensible aid to the court of appeals reviewing the district court's decision. (3) "[A]dequate adversary testing" would be ensured by opposing counsel's access to the information included in the agency's detailed and indexed justification and by *in camera* inspection, guided by the detailed affidavit and using special masters appointed by the court whenever the burden proved to be especially onerous. *Id.* 157 U.S.App.D.C. at 348, 484 F.2d at 828.[12]

In proposing the 1974 amendments, the Senate Committee outlined the ruling in *Vaughn* and added, "The committee supports this approach. . . ."[13]

### The judicial function as emphasized by 1974 amendments

In some of the decisions involving national security issues, there has been confusion about the nature of the evidentiary burdens and the scope of the district judge's discretion. This uncertainty is due to a misunderstanding of the legislative history of the 1974 amendments.[14] There were differences in 1974 between the Senate Committee and the House, between the Senate and its Committee, and between the Legislative and Executive Branches. For an authoritative exposition of the purpose and effect of the 1974 amendments, it suffices for present purposes to quote a few key paragraphs of the Conference Committee report:[15]

The conference substitute follows the Senate amendment, providing that in determining *de novo* whether agency records have been properly withheld, the court may examine records *in camera* in making its determination under any of the nine categories of exemptions under section 552(b) of the law. In *Environmental Protection Agency v. Mink, et al.,*

---

12. A remaining problem noted by the court in *Vaughn*—the failure of the district court's opinion to reveal the court's reasoning—was dealt with in *Schwartz v. IRS*, 167 U.S.App.D.C. 301, 305, 511 F.2d 1303, 1307 (1975). *Schwartz* held that the district court had abused its discretion by not granting a plaintiff/appellant's request for a clarification of the legal grounds of its opinion affirming the agency's refusal to disclose information sought under the FOIA. *See also Fisher v. Renegotiation Board*, 153 U.S.App.D.C. 398, 401, 473 F.2d 109, 112 (1972); *Bristol-Meyers Co. v. FTC*, 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938, *cert. denied*, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970); *Ackerly v. Ley*, 137 U.S.App.D.C. 133, 138–39, 420 F.2d 1336, 1341–42 (1969).

13. S.Rep. No. 93–854, 93d Cong., 2d Sess. 15 (1974).

14. The original decision in *Weissman v. CIA*, 184 U.S.App.D.C. 117, 565 F.2d 692 (1977), contained views from the legislative history on the scope and methods of review in national security cases that had been expressly rejected in the actual statute passed over President Ford's veto. *See Weissman v. CIA*, D.C.Cir. No. 76–1566, decided Jan. 6, 1977, slip op. at 10–11 & n.10. The opinion was corrected by amendment. *See* Order, D.C.Cir. No. 76–1566, April 4, 1977. Unfortunately, some courts, including the district court in this case, relied on the original version of *Weissman* before the amendments were published.

The original opinion in *Weissman* stated that Congress had recognized the lack of judicial expertise by indicating "that the court was not to substitute its judgment for that of the agency." *Weissman v. CIA, supra,* slip op. at 10 (preamendment version). In fact, Congress expressly refused to approve such deference.

In *Bell v. United States*, 563 F.2d 484 (1st Cir. 1977), the First Circuit relied in part on a portion of a Senate Report, S.Rep. No. 93–854, 93d Cong., 2d Sess. 16 (1974), that describes a provision in the Senate Bill as reported from committee that was later deleted on the floor of the Senate because it was considered too deferential to the agencies. To the extent that any language in *Bell* is inconsistent with the approach outlined in this opinion, we must respectfully decline to depart from our understanding of the mandate of Congress.

The result in *Bell* may be justified on the particular circumstances of that case. It was a suit to release over 500,000 documents gathered by the Allied Intelligence Service during World War II under the ULTRA program. The Secretary of Defense had exempted these documents from the automatic declassification schedule pending completion of a specific program designed to review individually the classification of all the documents by 1980.

15. S.Rep. No. 93–1200, 93d Cong., 2d Sess. 9, 12 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6267, 6287, 6290.

410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Supreme Court ruled that *in camera* inspection of documents withheld under section 552(b)(1) of the law, authorizing the withholding of classified information, would ordinarily be precluded in Freedom of Information cases, unless Congress directed otherwise. H.R. 12471 amends the present law to permit such *in camera* examination at the discretion of the court. While *in camera* examination need not be automatic, in many situations it will plainly be necessary and appropriate. Before the court orders *in camera* inspection, the Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure. The burden remains on the Government under this law.

\* \* \* \* \* \*

When linked with the authority conferred upon the Federal courts in this conference substitute for *in camera* examination of contested records as part of their *de novo* determination in Freedom of Information cases, this clarifies Congressional intent to override the Supreme Court's holding in the case of *E.P.A. v. Mink, et al.,* supra, with respect to *in camera* review of classified documents.

However, the conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.

The legislative history underscores that the intent of Congress regarding de novo review stood in contrast to, and was a rejection of, the alternative suggestion proposed by the Administration and supported by some Senators: that in the national security context the court should be limited to determining whether there was a reasonable basis for the decision by the appropriate official to withhold the document.[16] In proposing a "reasonable basis" standard, the Administration and supporting legislators argued that de novo responsibility and *in camera* inspection could not properly be assigned to judges, in part because of logistical problems, and in part because of their lack of relevant experience and meaningful appreciation of the implications of the material involved.[17] Those who prevailed in

---

**16.** *See, e. g.,* Message from President Gerald R. Ford Vetoing H.R. 12471, H.Doc. No. 93–383, 93d Cong., 2d Sess. (1974):

As the legislation now stands, a determination by the Secretary of Defense that disclosure of a document would endanger our national security would, even though reasonable, have to be overturned by a district judge who thought the plaintiff's position just as reasonable. Such a provision would violate constitutional principles, and give less weight before the courts to an executive determination involving the protection of our most vital national defense interests than is accorded determinations involving routine regulatory matters.

I propose, therefore, that where classified documents are requested the courts could review the classification, but would have to uphold the classification if there is a reasonable basis to support it. In determining the reasonableness of the classification, the courts would consider all attendant evidence

prior to resorting to an *in camera* examination of the document.

**17.** *See, e. g.,* 2 Freedom of Information, Executive Privilege, Secrecy in Government: Hearings before the Subcomm. on Administrative Practice and Procedure and Separation of Powers of the Senate Comm. on the Judiciary and the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations, 93d Cong., 1st Sess. 218–220 (1973) (testimony of Attorney General Richardson); letter from Malcolm D. Hawk, Acting Assistant Attorney General, to Hon. Chet Holifield, Chairman, House Comm. on Governmental Operations, Feb. 20, 1974, *reprinted in* Staffs of Senate Comm. on the Judiciary and House Comm. on Government Operations, Freedom of Information Act and Amendments of 1974 (P.L. 93–502); Source Book: Legislative History, Texts, and Other Documents (Comm. Print 1975) (hereinafter cited as Source Book); letter from L. Niederlehner, Acting General Counsel, Department of Defense, to Hon. Chet Holifield,

the legislature both resisted the Administration proposal on first consideration and voted to override President Ford's veto of the bill containing the provision for de novo review and *in camera* inspection. They stressed the need for an objective, independent judicial determination, and insisted that judges could be trusted to approach the national security determinations with common sense, and without jeopardy to national security.[18] They emphasized that in reaching a de novo determination the judge would accord substantial weight to detailed agency affidavits and take into account that the executive had "unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record."[19]

The salient characteristics of de novo review in the national security context can be summarized as follows: (1) The government has the burden of establishing an exemption. (2) The court must make a de novo determination. (3) In doing this, it must first "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record."[20] (4) Whether and how to conduct an *in camera* examination of the documents rests in the sound discretion of the court, in national security cases as in all other cases.[21] To these observations should be

Feb. 20, 1974, *reprinted in* Source Book, *supra,* at 143–144.

18. *See* 120 Cong.Rec. 36870 (1974) (Sen. Muskie):

As a practical matter, I cannot imagine that any Federal judge would throw open the gates of the Nation's classified secrets, or that they would substitute their judgment for that of an agency head without carefully weighing all the evidence in the arguments presented by both sides.

On the contrary, if we constrict the manner in which courts perform this vital review function, we make the classifiers themselves privileged officials, immune from the accountability necessary for Government to function smoothly.

*Id.* at 17030 (Sen. Ervin):

The court ought not to be required to find anything except that the matter affects or does not affect national security. If a judge does not have enough sense to make that kind of decision, he ought not to be a judge. We ought not to leave that decision to be made by the CIA or any other branch of the Government.

*Id.* at 17028 (Sen. Chiles):

If, as the Senator from Mississippi said, there is a reason, why are judges going to be so unreasonable? We say that four-star generals or admirals will be reasonable but a Federal district judge is going to be unreasonable. I cannot buy that argument, especially when I see that general or that admiral has participated in covering up a mistake, and the Federal judge sits there without a bias one way or another. I want him to be able to decide without blinders or having to go in one direction.

19. S.Rep. No. 93–1200, 93d Cong., 2d Sess. 12 (1974), U.S.Code Cong. & Admin.News 1974, p. 6290.

20. *Id.*

21. The Senate Committee Report on the 1974 amendments emphasizes the procedural flexibility available to a district judge.

In making this [exemption] determination, the court must *first* attempt to resolve the matter "on the basis of affidavits and other information submitted by the parties." If it does decide to examine the contested records in camera, the court may consider further argument by both parties, may take further expert testimony, and may in some cases of a particularly sensitive nature decide to entertain an ex parte showing by the government. S.Rep. No. 93–854, 93d Cong., 2d Sess. 15–16 (1974) (emphasis added).

During the House debates that led to an override of President Ford's veto of the 1974 amendments, Representative William Moorhead, the cognizant Subcommittee Chairman, made the following observation on available court procedure under the bill.

[The court] can discuss the affidavit with Government attorneys in camera, or employ other similar means to obtain sufficient information needed to make a judgment. Only if such means cannot provide a clear justification for the classification markings would the court order an in camera inspection of the document itself. If the examination and subsequent discussions of the affidavit from the agency indicate that the classification assigned to the particular document is reasonable and proper under the Executive order and implementing regulations, the court would clearly rule for the Government and order the requested document withheld from the plaintiff. But if the examination and subsequent discussions of the affidavit from the agency could not resolve the issue, the court could then order the production of the document and examine it in camera to determine if the

added an excerpt from our opinion in *Weissman* (as revised): "If exemption is claimed on the basis of national security the District Court must, of course, be satisfied that proper procedures have been followed, and that by its sufficient description the contested document logically falls into the category of the exemption indicated." [22]

In part, the foregoing considerations were developed for Exemption 1. They also apply to Exemption 3 when the statute providing criteria for withholding is in furtherance of national security interests.

### In camera inspection

■ In the case at bar, the district court observed: "With respect to documents withheld under exemption 3, in camera inspection is seldom, if ever, necessary or appropriate." [23] The legislative history does not support that conclusion. Congress left the matter of *in camera* inspection to the discretion of the district court, without any indication of the extent of its proper use. The ultimate criterion is simply this: Whether the district judge believes that *in camera* inspection is needed in order to make a responsible de novo determination on the claims of exemption.

■■ *In camera* inspection requires effort and resources and therefore a court should not resort to it routinely on the theory that "it can't hurt." When an agency affidavit or other showing is specific, there may be no need for *in camera* inspection.

On the other hand, when the district judge is concerned that he is not prepared to make a responsible de novo determination in the absence of *in camera* inspection, he may proceed *in camera* without anxiety that the law interposes an extraordinary hurdle to such inspection. The government would presumably prefer *in camera* inspection to a ruling that the case stands in doubt or equipoise and hence must be re-solved by a ruling that the government has not sustained its burden.

■ The issue of bad faith merits a word. The memorandum of the district court noted that there was no evidence of bad faith on the part of the Agency's officials. Where the record contains a showing of bad faith, the district court would likely require *in camera* inspection. But the government's burden does not mean that all assertions in a government affidavit must routinely be verified by audit. Reasonable specificity in affidavits connotes a quality of reliability. When an affidavit or showing is reasonably specific and demonstrates, if accepted, that the documents are exempt, these exemptions are not to be undercut by mere assertion of claims of bad faith or misrepresentation.

■ *In camera* inspection does not depend on a finding or even tentative finding of bad faith. A judge has discretion to order *in camera* inspection on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a de novo determination. Government officials who would not stoop to misrepresentation may reflect an inherent tendency to resist disclosure, and judges may take this natural inclination into account.

### III. RULINGS FOR THE CASE AT BAR

Two affidavits were executed by Eloise Page, Chief, Operations Staff of the Directorate of Operations of the CIA. The first is a general statement about the dangers at large of disclosure, background and local color rather than any attempt to link these concerns with specific documents. It is of little aid in the task of deciding whether the nine specific documents now sought come within the claimed exemptions.

---

classification marking was properly authorized.
Source Book, note 17 *supra*, at 405–06.

**22.** *Weissman v. CIA*, 184 U.S.App.D.C. 117, 122, 565 F.2d 692, 697 (1977). Whether there is a "sufficient description" to establish the exemptions is, of course, a key issue.

**23.** Memorandum Opinion at 4.

*Documents 2–6*

Page's second affidavit, set out in the appendix, purports to link specific exemptions to specific documents. A glaring defect is that it lumps the exemptions together and fails to identify whether different exemptions are claimed as to different parts of each document. The statement for document 2 reads:

This document is a three-page memorandum the subject of which is "Rennie Davis and Friends." It is essentially the debriefing report of a sensitive intelligence source. The majority of the information concerns individuals other than the plaintiffs.

This document has been denied in its entirety, primarily to protect intelligence sources and methods since the release of any meaningful portion would disclose the identity of the source, and further, to protect cryptonyms, names of CIA personnel and CIA organizational data. Thus exemptions (b)(1), (b)(3) and (b)(6) apply.

The statement for documents 3, 4 and 5 reads:

These documents are one-page cables from an overseas CIA installation which advise Headquarters of the receipt of documents and information from a foreign intelligence service and which concern the plaintiffs and other individuals. They are denied in their entirety pursuant to Freedom of Information Act exemptions (b)(1), (b)(3) and (b)(6).

In reviewing the judgment on documents 2–6, we encounter a complex of difficulties. Exemption 3 permits a withholding under the provisions of 50 U.S.C. § 403g (1970), which specifies that "in order further to implement the proviso of section 403(d)(3) of this title that the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the Agency shall be exempted from . . . the provisions of any . . . law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency . . . ." *Goland v. CIA*, No. 76–1800, slip op. at 16–17 (D.C.Cir., May 23, 1978); *cf. Weissman v. CIA*, 184 U.S.App. D.C. 117, 119, 565 F.2d 692, 694 (1977). However, in *Goland*, the affidavit demonstrated "in nonconclusory and detailed fashion" (slip op. at 21), that the deleted material disclosed intelligence sources and methods. The CIA's affidavit as to documents 2–6 is not a specific presentation such as that in *Goland*. The statement that the release of any meaningful portion of document 2 would disclose the identity of a "sensitive intelligence source" has some particularity, but it runs into a failure to address specifically whether the disclosure of substantive information may be possible without the disclosure of source, and if not why not.

As to Exemption 1, the information that document 2 relates to "Rennie Davis and Friends," might be some indication that it was reasonable for the official involved to have classified it in the first instance. But that mere reference is not enough information to permit a judge to make an independent ruling that the classification was proper.

Finally, what overhangs and in a sense pervades this case, more vivid as to document 2 but implicit as to the other documents, is the real possibility that what animates the CIA's broadsword withholding is the fact that the documents contain commentary on a group of persons, with the CIA's position being that Exemption 6 prohibits any revelation from its files about individuals other than appellants. We discuss Exemption 6 further below. It suffices here to say that we do not have any analysis of Exemption 6 by the district court, and the problem is complex.

██ Overall, we have a critical problem of segregability, that some portion of the document(s) may be exempt, but that the FOIA might contemplate disclosure in part. The difficulty arises from the CIA's proffer of multiple exemptions for each withheld document, and is maintained by the district court's conclusory rulings.

The reviewing court should not be required to speculate on the precise relationship between each exemption claim and the contents of the specific document. The district judge is not called upon to take on the role of censor—going through a line-by-line analysis for each document and removing particular words. If, however, the problematic material appears in a particular place or places that can be manageably identified, indexing is not to be bypassed because it is something of a chore.

*Documents 7–9*

Page's affidavit describes document 7 as follows:

> Document No. 7 is a three-page cable from CIA Headquarters to the Director, FBI, which provides information on an individual under investigation for the bombing of the United States Capitol on March 1, 1971. It is the report of a highly sensitive, foreign intelligence source.

Page's affidavit identifies documents 8 and 9 as intra-agency cables concerning the same matter. It continues: "Each of these documents contains a single, peripheral and non-substantive reference to the Plaintiff Schaap. In each case, that portion has been provided to the plaintiff."

Documents 7–9 identify a particular subject: information concerning an individual under investigation for the 1971 bombing of the Capitol. There are manifest disclosure problems under Exemption 6 in view of the privacy interests of that individual, as well as under Exemptions 1 and 3. However, the CIA affidavit does not specifically claim that all of the documents (7–9) are exempt under Exemption 6, and that there are no other portions that may be reasonably segregable. And the district court's ruling was solely on Exemptions 1 and 3.

Apparently the only direct reference to Schaap in these three documents is the material that CIA has furnished to him, a bare mention of his name and address in document 7, plus the information in documents 8 and 9 that he is a partner in a law firm that has represented the Black Panther party.

The CIA does not take the position that the furnishing of these references is fully responsive to Schaap's request. It has properly refrained from an approach whereby FOIA applications are read technically and narrowly, like a common law pleading.

However, the CIA again has not been responsive to the requirement that it provide specific affidavits that segregate each of its claims. The "exemption by document" approach has been rejected by our opinions, notably *Vaughn*, 157 U.S.App.D.C. at 345–46, 484 F.2d at 825–26, and *Mead Data Central, Inc. v. Dept. of the Air Force*, 184 U.S.App.D.C. 350, 367–70, 566 F.2d 242, 259–62 (1977). The agency may not rely on that approach even in a national security context. The agency must provide a reasonable segregation as to the portions of the document that are involved in each of its claims for exemption. As indicated in *Mead*, it is important that the affidavit indicate the extent to which each document would be claimed as exempt under each of the exemptions. The courts cannot meaningfully exercise their responsibility under the FOIA unless the government affidavits are as specific as possible.

*Document 10*

The withholding of document 10 cannot be disposed of on the basis of Exemptions 1 and 3, as the district court held. The government concedes that some of the information in that document is not within the ambit of those exemptions. It argues instead that there is justification for withholding under Exemptions 6 and 7. However, the district court did not rule on these exemptions. We think that their applicability should be considered in the first instance by the district court and remand for that purpose.

The applicability of Exemption 6 depends, as the Supreme Court, held in *Department of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), on a particularized balancing of privacy interests and the " 'public's right to governmental information.' " *Id.* at 372, 96 S.Ct. 1592 (quoting

S.Rep. No. 813 89th Cong., 1st Sess. 9 (1965)). An Exemption 6 claim was raised by the CIA for all the documents sought by plaintiffs and its position was set forth in a paragraph of the first Page affidavit.[24] The first sentence of that paragraph suggests that the CIA conducts its own balancing test to determine whether the disclosure of the names of others would involve a "clearly unwarranted invasion of privacy." The remainder of the paragraph tends to indicate that the CIA has a broad policy that prohibits disclosures from CIA files of references to individuals other than the applicant as an invasion of privacy. The point is made that many of these references are innocent yet would reflect disparagingly on the individuals due to the climate of opinion concerning the CIA and its activities. This application of Exemption 6 would be more far-reaching than our conclusion that privacy interests protected by Exemption 6 are brought into play by a stigmatizing disclosure of another individual as linked to a bombing of the Capitol.

The problem requires a balancing analysis. Before the district court considers the matter on remand, it will be able to obtain clarification as to CIA policy and approach.

\*     \*     \*     \*     \*     \*

We remand for reconsideration of the CIA's exemption claims in light of clarification of the affidavits and for further proceedings not inconsistent with this opinion.

*So ordered.*

## APPENDIX
### SUPPLEMENTAL AFFIDAVIT

Eloise Page, being first duly sworn, deposes and says:

1. I am Chief, Operations Staff of the Directorate of Operations of the Central Intelligence Agency (CIA). I have personal knowledge of the facts set forth herein, which were obtained by me in my official capacity.

2. Pursuant to the above-captioned litigation, I have again examined documents number 1 through 10 and make the following additional statements as to their contents, the information withheld and the reasons therefore.

| Document Number | Statement |
|---|---|
| 1 | This document is a one-page dispatch from an overseas CIA installation to Headquarters. It transmitted a United States Army report which has been referred to the Department of the Army for their action and direct response to the plaintiff. |
|  | This document has been provided to the plaintiffs with only minor deletions. The material deleted includes the location of CIA overseas installations, cryptonyms, a pseudonym and CIA organizational data. Thus exemptions (b)(1) and (b)(3) apply. |
| 2 | This document is a three-page memorandum the subject of which is "Rennie Davis and Friends." It is essentially the debriefing report of a sensitive intelligence source. The majority of the information concerns individuals other than the plaintiffs. |
|  | This document has been denied in its entirety, primarily to protect intelligence sources and methods since the release of any meaningful portion would dis- |

---

24. Appendix at 39: "Information concerning individuals other than the plaintiffs in these documents was withheld in those instances in which release of the information would result in a clearly unwarranted invasion of the personal privacy of persons named in the document. The fact that an individual is mentioned in a record maintained by the CIA, or is the subject of a CIA file, is easily misunderstood by the general public although the inclusion of such a person's name in CIA records does not in any way necessarily imply that such individual is viewed in any negative context. Such record may be created because an individual may be a CIA employee applicant, furnished information to the CIA and was thus an intelligence source or a potential intelligence source, etc. Accordingly, and particularly in view of the current publicity and controversy surrounding the CIA, the identity of individuals who are subjects of CIA files or are mentioned in CIA records is not disclosed under the authority of exemption (b)(6) of the Freedom of Information Act on the grounds that disclosure would constitute a clearly unwarranted invasion of an individual's personal privacy."

| Document Number | Statement |
|---|---|
| | close the identity of the source, and further, to protect cryptonyms, names of CIA personnel and CIA organizational data. Thus exemptions (b)(1), (b)(3) and (b)(6) apply. |
| 3, 4, 5 | These documents are one-page cables from an overseas CIA installation which advise Headquarters of the receipt of documents and information from a foreign intelligence service and which concern the plaintiffs and other individuals. |
| | They are denied in their entirety pursuant to Freedom of Information Act exemptions (b)(1), (b)(3) and (b)(6). |
| 6 | This document is a one-page dispatch which transmits to Headquarters the above-described matter received from a foreign intelligence service. |
| | It is denied in its entirety pursuant to Freedom of Information Act exemptions (b)(1), (b)(3) and (b)(6). |
| 7, 8, 9 | Document No. 7 is a three-page cable from CIA Headquarters to the Director, FBI, which provides information on an individual under investigation for the bombing of the United States Capitol on March 1, 1971. It is the report of a high sensitive, foreign intelligence source. |
| | Document No. 8 is a two-page cable from an overseas CIA installation to CIA Headquarters concerning the same matter. |
| | Document No. 9 is a two-page cable from CIA Headquarters to the same overseas CIA installation concerning the same matter. |
| | Each of these documents contains a single, peripheral and non-substantive reference to the Plaintiff Schaap. In each case, that portion has been provided to the plaintiff. The remainder of each document may not be released pursuant to Freedom of Information Act exemptions (b)(1), (b)(3) and (b)(6). |
| 10 | This document consists of a one-page memorandum which transmits a copy of a notebook containing a list of names. This list was secured by the United States Customs Service from an individual at a border checkpoint in a search incident to his arrest for importation of narcotics into the United States. The memorandum was provided to the Plaintiff Schaap with only minor deletions (names of CIA employees, organizational data concerning the CIA, name of a United States Customs Agent). Only that portion of the list containing plaintiff's name was provided. Thus exemptions (b)(1), (b)(3), (b)(6) and (b)(7)(F) apply. |

/s/ Eloise Page
ELOISE PAGE

---

J. SKELLY WRIGHT, Chief Judge, concurring in the remand: [1]

I concur in the court's conclusions (1) that the CIA's affidavits in support of its claims of exemption are ambiguous and unsatisfactory; (2) that the District Court erred in recognizing presumptions against *in camera* examination (a) in national security cases and (b) in cases involving claims of Exemption 3; and (3) that the case must therefore be remanded to the District Court for further proceedings consistent with the mandate of Congress and the precedents of this court. The *per curiam's* changes, in the light of experience, in the ad-

In passing the Freedom of Information Act (FOIA) the Congress made a national vice given the District Courts in earlier cases, such as *Weissman v. CIA*, 184 U.S.App.D.C. 117, 565 F.2d 692 (1977), are obvious and significant. Nevertheless, I am disturbed by the terse and at times conclusory fashion in which these important conclusions are rendered. The *per curiam* opinion fails, in my view, to address adequately the arguments that agencies have used and will no doubt continue to use in their attempts to undermine the positions the court now embraces. Furthermore, the court's discussion of the legislative history leaves out

commitment to public scrutiny of the federal departments and agencies, and it entrusted the federal courts with implementation of this commitment. *Department of the Air Force v. Rose,* 425 U.S. 352, 360–362, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). In authorizing but nine exemptions from public disclosure of bureaucratic records, Congress made clear that the accent must be on disclosure, not suppression; that the exemptions should be narrowly construed to prevent subversion of the national commitment to public disclosure.[2]

Nevertheless, the federal bureaucracy has been extremely reluctant to embrace the principle of public disclosure on which the FOIA is founded and, with significant help from the federal courts interpreting the exemptions broadly, not narrowly, has succeeded in frustrating much of its implementation—so much so that Congress has repeatedly overruled court decisions restricting disclosure by amending the Act.[3] It is against this legislative, judicial, and bureaucratic background, which will be out-

lined in detail herein, that I consider the issues which this case presents.

This case involves an area in which courts have been especially cautious in assuming the supervisory role assigned them by Congress: requests for information whose release would allegedly endanger national security. Appellants Ellen Ray and William Schaap, stating individually their belief that they might be among "the approximately 10,000 American civilians on whom [the Central Intelligence Agency (CIA)] had concededly maintained files," sought from the CIA "any file you may have on me."[4] The Agency responded that although it did not have a "file" on either appellant it had located several documents that mentioned each of them. The CIA refused to release these documents, however, claiming they were exempt from disclosure under Exemptions 1 and 3 of the FOIA, 5 U.S.C. §§ 552(b)(1), (b)(3) (1976), because some were classified pursuant to Executive order and others would reveal intelligence sources and methods.[5] The initial denial of appellants' requests was affirmed on appeal within the CIA, primarily on the basis of

---

much of the information that District Courts should have before them when they structure their *de novo* reviews of FOIA claims. For these reasons, and because of the importance of the issues involved, I have decided to set forth in full my views on them and on their application to the facts of this case.

2. Under the FOIA Congress ultimately decides what kinds of information may be withheld and the courts ultimately decide whether the information sought in a particular case fits the criteria laid down by Congress. *See* text and notes at notes 10–13 *infra.*

3. *See* Part I–A *infra.*

4. Letters from Ellen L. Ray and William H. Schaap to Angus M. Thuermer, Assistant to the Director, CIA, March 14, 1975, Joint Appendix (JA) 15, 16.

5. Letters from Robert S. Young, Freedom of Information Coordinator, CIA, to Ellen L. Ray, April 4, 1975, JA 17, and William H. Schaap, April 11, 1975, JA 18.

Exemption 1 covers matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C.

§ 552(b)(1) (1976). Exemption 3 covers matters that are "specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3) (1976). The CIA also claimed that one document relating to appellant Schaap was an interagency memorandum covered by Exemption 5, 5 U.S.C. § 552(b)(5) (1976).

The letter to appellant Schaap illustrates the lack of specificity in the Agency's response:

The Agency does not have a file on you. A search of various indices has located eight Agency items which appear to pertain to you. Seven of these documents, which reference your foreign travel and association with other individuals, are classified properly and/or they contain information the disclosure of which would divulge intelligence sources and methods. Therefore, they cannot be released to you in accord with exemptions (b)(1) and (b)(3) of the Freedom of Information Act. One item is an inter-agency memorandum which is exempt under (b)(3) and (b)(5).

Letter from Young to Schaap, *supra,* at JA 18.

Exemption 3.[6] Appellants then brought this suit under the FOIA to compel disclosure. 5 U.S.C. § 552(a)(4)(B) (1976). When forced to support its denial with detailed affidavits,[7] the CIA revealed that it controlled 10 documents that referred to one or both appellants and released portions of five of these. The Agency continued to withhold most of the information, however, relying on Exemptions 1, 3, 6, and 7(F).[8] The CIA then moved for summary judgment on the basis of its affidavits, and appellants moved for an *in camera* inspection of the disputed information. Before any discovery had taken place the District Court denied appellants' motion and granted summary judgment for the CIA on the ground that all the information still being withheld was exempt from disclosure under Exemptions 1 and 3.[9] The court found it unnecessary to determine whether any other exemptions applied. Ray and Schaap then appealed to this court, challenging the grounds on which the District Court had granted summary judgment and the sufficiency of the CIA affidavits.

## I. THE EVOLUTION OF FOIA REVIEW

In 1966 Congress amended the Administrative Procedure Act (APA) to increase disclosure of government information to the American people.[10] Congress had determined that the previous "public information" section of the APA, 5 U.S.C. § 1002 (1964), was "of little or no value to the

---

**6.** Letters from John F. Blake, Chairman, CIA Information Review Committee, to Ellen L. Ray, May 16, 1975, JA 21, and William H. Schaap, May 16, 1975, JA 22. Appellants had questioned the Agency's initial response on grounds that information relating to their foreign travels or to their associations with others would be quite unlikely in their opinion to be properly classifiable or to reveal intelligence sources, and that there must be some segregable portions of the documents. Letter from Ellen L. Ray to Robert S. Young, April 9, 1975, JA 19; letter from William H. Schaap to CIA Information Review Committee, April 15, 1975, JA 20. The relevant portion of the letter to appellant Schaap reads:

> After reviewing the CIA documents involved it has been determined that neither the entire documents, nor meaningful portions of them, could be released without revealing confidential intelligence sources. We are, therefore, prohibited from releasing the documents under the provisions of section 102(d)(3) of the National Security Act of 1947. Exemption 3 of the Freedom of Information Act exempts such documents from disclosure.
>
> In addition, some of the documents are validly classified pursuant to Executive order and it has been determined that they may not be declassified at this time.
>
> One of the documents considered by the Committee pursuant to your appeal originated with another Government agency. This document is being referred to the other agency for their determination as to whether it may be released.

Letter from Blake to Schaap, *supra,* at JA 22

**7.** *See Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 484 F.2d 820 (1973). I note that appellants had to bring this suit before the Agency would provide this more detailed description of the

information being withheld, and that once the description was prepared the Agency realized that there were, indeed, at least some segregable portions that could be released. *See* Affidavits of Robert S. Young, August 13, 1976, JA 27–30, and Eloise Page, August 13, 1976, JA 31–41, with attachments, JA 42–53 (portions released).

**8.** *See* Affidavit of Eloise Page, *supra* note 7, at JA 40–41; Supplemental Affidavit of Eloise Page, September 27, 1976, JA 62–64. For texts of Exemptions 1 and 3, *see* note 5 *supra.* Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1976). Exemption 7(F) covers "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would * * * endanger the life or physical safety of law enforcement personnel." 5 U.S.C. § 552(b)(7)(F) (1976).

**9.** *Ray v. Bush,* Civil Action No. 76–0903 (D.D.C. Jan. 25, 1977), JA 65–70.

**10.** The Senate Report explained the purpose of the FOIA by quoting the following words of James Madison, which had also been quoted by Senator Long when he introduced one of the predecessor bills in Congress:

> Knowledge will forever govern ignorance, and a people who mean to be their own governors, must arm themselves with the power knowledge gives. A popular government without popular information or the means of acquiring it, is but a prologue to a farce or a tragedy or perhaps both.

S.Rep. No. 813, 89th Cong., 1st Sess. 2–3 (1965).

public in gaining access to records of the Federal Government" because it allowed "any Government official * * * under color of law [to] withhold almost anything from any citizen under the vague standards —or, more precisely, lack of standards—in [Section 1002]." S.Rep. No. 813, 89th Cong., 1st Sess. 5 (1965). Section 1002 gave the agencies broad and effectively unreviewable discretion to determine whether information should be withheld "for good cause" or "in the public interest," and Congress found that as a result "[i]nnumerable times * * * information is withheld only to cover up embarrassing mistakes or irregularities * * *." *Id.* at 3.

The Freedom of Information Act sought to remedy these defects by transferring from the agencies to Congress and the courts primary responsibility for determining whether information could be withheld. Several specific provisions accomplished this transfer: (1) agencies were required to disclose all records that did not come within one of nine specific exemptions written by Congress;[11] (2) courts were given authority to review *de novo* any denial of access "in order that the ultimate decision as to to the propriety of the agency's action is made by the court and [to] prevent [review] from becoming meaningless judicial sanctioning of agency discretion";[12] and (3) in any review proceeding an agency denying disclosure, rather than enjoying a presumption of correctness, was saddled with the burden of proving that its action was proper.[13]

**11.** 5 U.S.C. § 552(c) (1976); *EPA v. Mink*, 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

**12.** S.Rep. No. 813, *supra* note 10, at 8; *see* 5 U.S.C. § 552(a)(3) (1970).

**13.** * * * In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. * * *

5 U.S.C. § 552(a)(3) (1970).

**14.** *Mink* involved a request for documents prepared by various government officials for the President in connection with a scheduled nuclear test. The documents were withheld under Exemptions 1 and 5. Those seeking the information made no challenge to the government's claim that proper classification *procedures* had been followed, 410 U.S. at 84, 93 S.Ct. 827, and

**A.** *Restrictive Interpretation and Corrective Legislation:* Mink *and* Robinson

The ambitious scheme established by the FOIA was not without its difficulties. The agencies were quick to discover ambiguities in the language of the nine exclusive exemptions, and courts have often proved too sensitive to the potential burdens of *de novo* review and to their alleged lack of expertise. Indeed, in two of its first FOIA cases the Supreme Court interpreted the two exemptions relied on by the District Court in this case in ways that restricted the reviewing court's role and preserved the discretion of the withholding agency. In each case Congress soon reversed the Court's interpretation by legislation.

First, in *EPA v. Mink*, 410 U.S. 73, 81–84, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Court held that when an agency relied on Exemption 1, which at that time covered matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy," 5 U.S.C. § 552(b)(1) (1970), a reviewing court could affirm the nondisclosure solely on the basis of an agency affidavit stating that the requested documents had been duly classified pursuant to Executive order.[14] According to the Court, "Congress chose to follow the Executive's determination in these matters," and *in camera* inspection to test the propriety of the classification was neither authorized nor permitted. 410 U.S. at 81, 93 S.Ct. at 833. Within two years Congress

the Court held that the *substantive* propriety of the classification had been committed by Congress to Executive discretion. The Court therefore reversed the order of the Court of Appeals that the District Court examine the documents *in camera* and release any segregable nonsecret portions. With regard to Exemption 5 the Court held that a reviewing court should allow an agency the opportunity to prove by detailed affidavits and other evidence that material withheld is exempt before requiring *in camera* inspection. The Court accordingly modified the "unnecessarily rigid" remand ordered by the Court of Appeals in order to provide the government a chance to meet its burden by other methods before the court resorted to *in camera* inspection. *Id.* at 92–93, 93 S.Ct. 827.

overrode a presidential veto to amend the FOIA with the express purpose of overruling this aspect of the *Mink* case.[15] Exemption 1 was modified to exempt only matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (1976). Furthermore, the language describing the role of a reviewing court considering *any* claim of exemption was amended to provide that "the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B) (1976). The Conference Report accompanying the amendments explained that "[w]hile *in camera* examination need not be automatic, *in many situations it will plainly be necessary and appropriate.*" S.Rep. No. 1200, 93d Cong., 2d Sess. 9 (1974) (emphasis added).

The second Supreme Court case involved Exemption 3, which originally exempted matters "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3) (1970). In *FAA Administrator v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), the Court held that a statute could "specifically exempt" matters from disclosure even if the statute gave an agency broad discretion to determine whether

the information should be withheld.[16] As noted above, congressional concern about excessive agency discretion to withhold information had been a prime stimulus to enactment of the FOIA. Alarmed by the threat to the purposes of the FOIA created by the *Robertson* decision, Congress acted within 15 months to overrule the case by legislation.[17] Exemption 3 now authorizes nondisclosure of matters "specifically exempted from disclosure by statute * * * *provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.*" 5 U.S.C. § 552(b)(3) (1976) (emphasis added).

### B. *Creative Judicial Responses:* Vaughn v. Rosen

Not all judicial decisions involving the FOIA have suffered from the restrictive attitude apparent in the aspects of the *Mink* and *Robertson* cases overruled by Congress.[18] Courts have sometimes shown a willingness to assume the initiative in developing creative solutions to the problems associated with *de novo* review of refusals to disclose information. In *Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), for example, this court acknowledged the difficulty of reviewing the record before it, but then attempted to do something to correct the situation. The Civil Service Commission had withheld documents totalling "many hundreds of pages" and had supported its action with an affida-

---

**15.** S.Rep. No. 1200, 93d Cong., 2d Sess. 11–12 (1974); *see* Pub.L. 93–502, §§ 1–3, 88 Stat. 1561 (1974). *See* text and notes at notes 26–37 *infra.*

**16.** The statute relied on by the government in *Robertson* empowered the Administrator or the Board of the Federal Aviation Administration to withhold agency records if "any person" made a written objection to disclosure and "when, in their judgment, a disclosure of such information would adversely affect the interests of such person and is not required in the interest of the public." 49 U.S.C. § 1504 (1976).

**17.** House Conference Report No. 94–1441, 94th Cong., 2d Sess. 25 (1976); *see* Government in the Sunshine Act, Pub.L. No. 94–409, § 5(b), 90 Stat. 1247 (1976).

**18.** In *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the Supreme Court interpreted Exemptions 2 and 6 in a way that cut back on expansive interpretations of these exemptions and encouraged fuller disclosure. Congress expressly approved the Court's action in *Rose* with regard to Exemption 6 when it passed the Government in the Sunshine Act later in the year. *See* House Conference Report No. 94–1441, *supra* note 17, at 15.

vit stating only in general terms that the material was exempt under three exemptions to the FOIA.[19] The appellants challenged not only the claim that the exemptions covered the material withheld but also the agency's description of the nature of the material. *De novo* review under these circumstances would have required an enormous expenditure of judicial energy, not only to inspect all the material *in camera*, but to determine which portions were exempt under which exemptions. 157 U.S. App.D.C. at 345, 484 F.2d at 825. The District Court had granted summary judgment in favor of the agency, but had not stated any grounds for its action, thus leaving the Court of Appeals with nothing to review except the conclusory affidavit and the withheld materials.

This court noted the irony that, while the FOIA placed an "overwhelming emphasis upon disclosure," the facts relevant to judicial review of nondisclosure were totally within the control of the party refusing disclosure. *Id.*, 157 U.S.App.D.C. at 343, 484 F.2d at 823. Even an *in camera* inspection by the court is an *ex parte* proceeding conducted without the adversarial assistance of the party seeking disclosure.[20] Thus, although the statute specified that the *agencies* were to bear the burden of sustaining their refusals to disclose requested materials, the greatest burden was in practice being placed on the *courts*.

To bring practice more into line with the statutory mandate, this court initiated pro-

cedures designed to shift the burden of justifying nondisclosure back to the agencies and to give the party seeking disclosure a greater chance to participate in the review proceeding. The court took its cue from a portion of the Supreme Court's *Mink* opinion that was not overruled by Congress—the portion discussing how a court should proceed when there was a factual dispute concerning the nature of the materials being withheld.[21] "Expanding" on the Supreme Court's "outline," the court established the following procedures: (1) A requirement that the agency submit a "relatively detailed analysis [of the material withheld] in manageable segments." "[C]onclusory and generalized allegations of exemptions" would no longer be accepted by reviewing courts, 157 U.S.App.D.C. at 346, 484 F.2d at 826. (2) "[A]n indexing system [that] would subdivide the document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification." *Id.*, 157 U.S.App.D.C. at 347, 484 F.2d at 827. This index would allow the District Court and opposing counsel to locate specific areas of dispute for further examination and would be an indispensable aid to the Court of Appeals reviewing the District Court's decision. (3) "[A]dequate adversary testing," to be insured by opposing counsel's having the information included in the agency's detailed and indexed justification and by *in camera* inspection, guided by the detailed affidavit and using special masters appointed by the court when the burden was espe-

19. *Vaughn* was a suit by a law professor seeking disclosure of reports by the Bureau of Personnel Management of the Civil Service Commission. In defense of its refusal to disclose the information the CSC had submitted to the District Court an affidavit setting "forth in conclusory terms the Director's opinion [based on Exemptions 2, 5, and 6] that the evaluations were not subject to disclosure under the FOIA." *Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 343, 484 F.2d 820, 823 (1973).

20. *Id.*, 157 U.S.App.D.C. at 345, 484 F.2d at 825. Commentators have also pointed out the disadvantages of *in camera* inspection as a technique for reviewing denials of FOIA requests. *See, e. g.,* Comment, *In Camera In-*

*spections Under the Freedom of Information Act,* 41 U.Chi.L.Rev. 557, 559–561 (1974) (disadvantages include: no opportunity for party seeking information to present informed interpretation of the facts, a defect that is aggravated when a trial court's decision is appealed; lack of precedential value of decisions based on *in camera* inspection; and burdens on courts and agencies).

21. *See EPA v. Mink, supra* note 11, 410 U.S. at 92–94, 93 S.Ct. at 835; note 13 *supra.* At the time this court decided *Vaughn* Congress had not yet enacted the 1974 amendments to the FOIA, and both aspects of the *Mink* case were still good law.

cially onerous. *Id.,* 157 U.S.App.D.C. at 348, 484 F.2d at 828.[22]

The *Vaughn* procedures were an innovative step toward making *de novo* review a reality, but even this court has recognized that they are no panacea. *See, e. g., Cuneo v. Schlesinger,* 157 U.S.App.D.C. 368, 374, 484 F.2d 1086, 1092 (1973) (Bazelon, J., concurring). Commentators generally have applauded the decision,[23] but some have raised troublesome questions about whether the new procedures would be enough to achieve the "adversariness" and real *de novo* review required by the FOIA.[24]

### C. Special Problems in Cases Involving National Security

While achieving the goals of the FOIA may well demand more than *Vaughn* requires, implementing even the minimal procedures outlined in *Vaughn* has proven difficult in cases that, like the one before us, involved claims of danger to national security. Persistent controversy has surrounded the question whether FOIA cases involving national security claims should be treated differently from other FOIA cases. Arguments have focused on the proper standard of judicial review and on the use of certain techniques—primarily *in camera* inspection—in the review process.

The Supreme Court sought to resolve this controversy when it held in *Mink* that courts could not question the substantive propriety of agency classifications in suits involving refusals to disclose based on Exemption 1 and that *in camera* inspection was therefore improper in such cases.[25] In response to the *Mink* case, however, Congress specifically considered the standard of review and the propriety of *in camera* inspection in cases involving national security issues (primarily Exemption 1 cases) when it developed and passed the 1974 FOIA amendments. Provisions concerning these issues were a major focus not only of congressional debate on these amendments, but also of President Ford's veto message. As noted above,[26] Congress overrode the President's veto and expressly provided for *de novo* review and permissive *in camera* examination in *all* FOIA cases, including those involving national security claims, thus rejecting the Nixon and Ford Administrations' attempts to salvage the *Mink* case's special limits on the scope and methods of review in national security cases. Nevertheless, some recent court decisions reveal a confusion over several passages in the legislative history of the 1974 amendments,[27]

---

**22.** A remaining problem noted by the court in *Vaughn*—the failure of the District Court's opinion to reveal the court's reasoning—was dealt with in *Schwartz v. IRS,* 167 U.S.App. D.C. 301, 305, 511 F.2d 1303, 1307 (1975). Recognizing the particularly difficult position of FOIA plaintiffs, this court held in *Schwartz* that the District Court had abused its discretion by not granting a plaintiff/appellant's request for a clarification of the legal grounds of its opinion affirming the agency's refusal to disclose information sought under the FOIA. *See also Fisher v. Renegotiation Board,* 153 U.S. App.D.C. 398, 402, 473 F.2d 109, 113 (1972); *Bristol-Myers Co. v. FTC,* 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938 (1970); *Ackerly v. Ley,* 137 U.S.App.D.C. 133, 138–139, 420 F.2d 1336, 1341–1342 (1969).

**23.** *See, e. g.,* Note, *The Investigatory Files Exemption to the FOIA: The D.C. Circuit Abandons* Bristol-Myers, 42 Geo.Wash.L.Rev. 869, 880–884, 890–893 (1974); Comment, *Toward True Freedom of Information,* 122 U.Pa.L.Rev. 731 (1974).

**24.** The *Vaughn* procedures do not provide that the plaintiff or his counsel may analyze the disputed documents—a step that seems essential if the plaintiff is to challenge the accuracy of the government's characterization of the documents in true "adversary" fashion. *See* 87 Harv.L.Rev. 854, 858–859 (1974). Some FOIA plaintiffs have asked that their counsel and/or experts of their choosing be granted access to the disputed material under a protective court order. *See Hayden v. CIA,* Civil Action No. 76–284 (D.D.C. Oct. 8, 1976). This court has approved an analogous procedure in a special context, *see United States v. AT&T,* 185 U.S. App.D.C. 254, 266, 567 F.2d 121, 133 (1977), and Congress has also approved this procedure "whenever possible." *See* text and note at note 50 *infra.*

**25.** *See* text and note at note 14 *supra.*

**26.** *See* text and note at note 15 *supra.*

**27.** This confusion was evident in this court's own decision in *Weissman v. CIA, supra* note 1. The original decision in that case contained

and a somewhat detailed examination of the legislative history is therefore in order to clarify congressional intent.

### 1. *Legislative History of the 1974 FOIA Amendments*

During committee consideration of the legislation that was to become the 1974 FOIA amendments, the Nixon Administration, asserting that the courts lacked the expertise to determine what information should be classified, vigorously resisted any attempt to overrule the restrictive holding of the *Mink* case.[28] The House Committee on Government Operations nevertheless refused to accord special treatment to national security cases and reported a bill providing for *de novo* review and permissive *in camera* inspection in all FOIA cases.[29] The full House overwhelmingly approved the reported bill with only a minor technical amendment.[30]

The bill reported by the Senate Committee on the Judiciary, on the other hand, reflected to some degree the influence of the Administration's arguments. It provided:

> (ii) In determining whether a document is in fact specifically required by an Executive order or statute to be kept secret in the interest of national defense or foreign policy, \* \* \* [i]f there has been filed in the record an affidavit by the head of the agency certifying that he has personally examined the documents withheld and has determined after such examination that they should be withheld under the criteria established by statute or Executive order referred to in subsection (b)(1) of this section, the court *shall sustain such withholding unless,* following its in camera examination, *it finds the withholding is without a reasonable basis under such criteria.*

views from the legislative history on the scope and methods of review in national security FOIA cases that had been expressly rejected in the actual statute passed over President Ford's veto. *See Weissman v. CIA,* D.C. Cir. No. 76–1566, decided Jan. 6, 1977, slip op. at 10–11 & n.10. The opinion had to be amended to correct this confusion. *See* Order, D.C. Cir. No. 76–1566, April 4, 1977. Unfortunately, some courts, including the District Court in this case, relied on the original version of *Weissman* before the amendments were published. *See* text and note at note 82 *infra.* The opinion of the First Circuit in *Bell v. United States,* 563 F.2d 484 (1st Cir. 1977), also indicates some confusion over the legislative history of the 1974 amendments. The First Circuit relied heavily on a portion of Senate Report No. 93–854, 93d Cong., 2d Sess. 16 (1974), that describes a provision in the Senate bill as reported from committee that was later deleted on the floor of the Senate because it was considered too deferential to the agencies. *See* 563 F.2d at 487; text and notes at notes 31–33 *infra.* The result in *Bell* may be justified by the particular circumstances of that case (a suit to release over 500,000 documents gathered by the Allied Intelligence Service in World War II under the ULTRA program which the Secretary of Defense had exempted from the automatic declassification schedule pending completion of a specific program designed to review individually the classifications of all the documents by 1980). To the extent that any language in *Bell* is inconsistent with the approach outlined in this opinion, I must respectfully decline to de-

part from my understanding of the unambiguous mandate of Congress.

**28.** *See, e. g.,* 2 Freedom of Information, Executive Privilege, Secrecy in Government: Hearings before the Subcomm. on Administrative Practice and Procedure and Separation of Powers of the Senate Comm. on the Judiciary and the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations, 93d Cong., 1st Sess. 218–220 (1973) (testimony of Attorney General Richardson); letter from Malcolm D. Hawk, Acting Assistant Attorney General, to Hon. Chet Holifield, Chairman, House Comm. on Governmental Operations, Feb. 20, 1974, *reprinted in* Staffs of Senate Comm. on the Judiciary and House Comm. on Government Operations, Freedom of Information Act and Amendments of 1974 (P.L. 93–502): Source Book: Legislative History, Texts, and Other Documents (Comm. Print 1975) (hereinafter cited as Source Book); letter from L. Niederlehner, Acting General Counsel, Department of Defense, to Hon. Chet Holifield, Feb. 20, 1974, *reprinted in* Source Book, *supra,* at 143–144.

**29.** *See* H.R. 12471, 93d Cong., 2d Sess. (1974), *reprinted in* Source Book, *supra* note 28, at 145–149; H.R.Rep. No. 93–876, 93d Cong., 2d Sess. 7–8 (1974), *reprinted in* Source Book, *supra* note 28, at 127–128.

**30.** Source Book, *supra* note 28, at 274–279. The final vote was 383 to 8. *Id.* at 276–278.

S. 2543, 93d Cong., 2d Sess., § b(2), *reprinted in* Staffs of Senate Committee on the Judiciary and House Committee on Government Operations, Freedom of Information Act and Amendments of 1974 (P.L. 93–502): Source Book: Legislative History, Texts, and Other Documents (Committee Print 1975) (hereinafter cited as Source Book), at 282 (emphasis added). The Committee Report accompanying the bill explained: ·

> This standard of review does not allow the court to substitute its judgment for that of the agency—as under a *de novo* review—but neither does it require the court to defer to the discretion of the agency, even if it finds the determination not arbitrary or capricious. Only if the court finds the withholding to be without a reasonable basis under the applicable Executive order or statute may it order the documents released.

S.Rep. No. 93–854, 93d Cong., 2d Sess. (1974), *reprinted in* Source Book, *supra*, at 168.

This partial victory for the Administration's viewpoint was short-lived. When the bill reported by the Committee reached the Senate floor, Senator Muskie, challenging the "outworn myth that only those in possession of military and diplomatic confidences can have the expertise to decide with whom and when to share their knowledge[,]" introduced an amendment to delete the provision establishing a special "reasonable basis" standard of judicial review in national security cases.[31] The Muskie amendment passed easily[32] despite continued arguments from Administration supporters that requiring *de novo* review with

the burden on the government would be unconstitutional and would risk exposing "classified material which the judicial branch is unprepared to properly evaluate."[33]

After the Senate had passed the amended version of its bill, the Senate and House bills were referred to a Conference Committee to iron out the differences. During the Conference deliberations. President Nixon resigned and was succeeded by President Ford, who wrote to the Conference Committee to express his reservations about certain aspects of the proposed legislation. President Ford objected in particular to placing the burden on the government to justify its classification of documents in a *de novo* proceeding. His proposed alternative indicated the areas of controversy:

> I could accept a provision with an express presumption that the classification was proper and with *in camera* judicial review only after a review of the evidence did not indicate that the matter had been reasonably classified in the interests of our national security. Following this review, the court could then disclose the document if it finds the classification to have been arbitrary, capricious, or without a reasonable basis. * * *

Letter from President Gerald R. Ford to Honorable William S. Moorhead, August 20, 1974, *reprinted in* Source Book, *supra*, at 380.

The Conference Committee did not adopt the President's proposal. Instead it followed the language of the Senate bill pro-

---

**31.** 120 Cong.Rec. 17023 (1974); *see id.* at 17022–17032. Senator Ervin, Chairman of the Senate Committee on Government Operations and a co-sponsor of Senator Muskie's amendment, explained the need for the amendment to the bill as follows:

> The bill provides that a court cannot reverse an agency even though it finds it was wrong in classifying the document as being one affecting national security, unless it further finds that the agency was not only wrong, but also unreasonably wrong.
> * * * * * *
> Why not let the judge determine that question, because national security is information that affects national defense and our dealings

with foreign countries? That is all it amounts to.

> If a judge does not have enough sense to make that kind of judgment and determine the matter, he ought not to be a judge * *.

*Id.* at 17030.

**32.** The vote was 56 to 29. 120 Cong.Rec. 17031–17032 (1974).

**33.** Letter from Attorney General William B. Saxbe to Hon. Roman L. Hruska, May 29, 1974, *reproduced at* 120 Cong.Rec. 17027 (1974) (remarks of Sen. Hruska).

viding for *de novo* review with the burden on the government and permissive *in camera* inspection in all FOIA cases, regardless of the exemption claimed. The Conference Report described the Committee's position as follows:

The conference substitute follows the Senate amendment, providing that in determining *de novo* whether agency records have been properly withheld, the court may examine records *in camera* in making its determination under any of the nine categories of exemptions under section 552(b) of the law. In *Environmental Protection Agency v. Mink, et al.*, 410 U.S. 73 [93 S.Ct. 827, 35 L.Ed.2d 119] (1973), the Supreme Court ruled that *in camera* inspection of documents withheld under section 552(b)(1) of the law, authorizing the withholding of classified information, would ordinarily be precluded in Freedom of Information cases, unless Congress directed otherwise. H.R. 12741 amends the present law to permit such *in camera* examination at the discretion of the court. While *in camera* examination need not be automatic, in many situations it will plainly be necessary and appropriate. Before the court orders *in camera* inspection, the Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure. The burden remains on the Government under this law.

S.Rep. No. 1200, *supra*, at 9.

With regard to Exemption 1 in particular, the Conference combined the language of the House and Senate bills to ensure that "[w]hen linked with the authority conferred upon the Federal courts in this conference substitute for *in camera* examination of contested records as part of their *de novo* determination in Freedom of Information cases, [the new language of Exemption 1] clarifies Congressional intent to override

the Supreme Court's holding in the case of *E.P.A. v. Mink, et al.*, supra, with respect to *in camera* review of classified documents." *Id.* at 12. Then, without shifting the burden of proof or weakening the requirement of *de novo* review or curtailing the propriety of *in camera* examination, the Conference Report added the following qualification with respect to judicial review in cases involving national defense and foreign policy matters:

However, the conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [*sic*] might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.

*Id.*

This qualification was apparently designed to allay the fears expressed by President Ford, but the President was unwilling to accept legislation that still clearly placed the burden on the government under a *de novo* standard of judicial review. The President therefore vetoed the bill after both Houses of Congress had passed the Conference version.[34] In his veto message the President offered a final proposal, quite similar to the bill originally reported by the Senate Committee on the Judiciary and rejected by the full Senate:

I propose, therefore, that where classified documents are requested the courts could review the classification, but would have to uphold the classification if there is a reasonable basis to support it. In determining the reasonableness of the classification, the courts would consider

---

**34.** Message from the President of the United States Vetoing H.R. 12471, An Act to Amend Section 552 of Title 5, United States Code, Known as the Freedom of Information Act, H.R. Doc. No. 93–983, 93d Cong., 2d Sess., *reprinted in* Source Book, *supra* note 28, at 483–485. The President also objected to provi-

sions of the amendments tightening the exemption for investigatory law enforcement files and establishing strict time limits for responding to FOIA requests, but his veto message gave primary consideration to his attack on *de novo* review in cases involving national security.

all attendant evidence prior to resorting to an *in camera* examination of the document.

Message from the President of the United States Vetoing H.R. 12471, H.Doc. No. 93–983, 93d Cong., 2d Sess., *reprinted in* Source Book, *supra,* at 484.

The debate on whether to override the President's veto rehearsed for one last time the arguments over the need for and the danger of *de novo* judicial review in cases involving issues of national security. In the wake of Watergate the sentiments of both Houses of Congress were perhaps most succinctly summarized by Senator Baker:

> In short, recent experience indicates that the Federal Government exhibits a proclivity for overclassification of information, especially that which is embarrassing or incriminating; and I believe that this trend would continue if judicial review of classified documents applied a presumption of validity to the classification as recommended by the President. De novo judicial determination based on in camera inspection of classified documents—as provided by the Freedom of Information Act amendments passed by the Congress—insures confidentiality for genuine military, intelligence, and foreign policy information while allowing citizens, scholars, and perhaps even Congress access to information which should be in the public domain.
>
> In balancing the minimal risks that a Federal judge might disclose legitimate

national security information against the potential for mischief and criminal activity under the cloak of secrecy. I must conclude that a fully informed citizenry provides the most secure protection for democracy.

Source Book, *supra,* at 460–461.[35] The House overrode the President's veto by a vote of 371 to 31; [36] the Senate followed by a vote of 65 to 27.[37]

### 2. Basic Principles Governing Judicial Review of FOIA Cases Involving National Security Claims

The basic thrust of the amendments is clear on the face of the bills passed by both Houses of Congress and the statute passed over the President's veto: claims of exemption from FOIA based on national security are, like all other claims of exemption, to be subject to *de novo* judicial review with the burden on the government and with permissive *in camera* examination. This court's task—one that the court's *per curiam* opinion in my view fails to perform adequately—is to explain what these general directions mean in practical terms and to take proper account of certain language inserted into the Conference Report in an unsuccessful attempt to compromise with the Ford Administration.

### a. De Novo *Review With the Burden on the Government and Permissive* In Camera *Inspection.*

The appropriate standard of review was at the core of the controversy between Con-

---

**35.** Senator Muskie recognized that his amendment, *see* text and notes at notes 31–33 *supra,* was at the crux of the President's objection to the bill and summarized the issue in this way:

> The conflict on this particular point boils down to one basic concern—trust in the judicial system to handle highly sensitive material. * * *
>
> * * * * * * *
>
> I cannot understand why we should trust a Federal judge to sort out valid from invalid claims of executive privilege in litigation involving criminal conduct, but not trust him or his colleagues to make the same unfettered judgments in matters allegedly connected to the conduct of foreign policy.
>
> As a practical matter, I cannot imagine that any Federal judge would throw open the gates of the Nation's classified secrets, or

that they would substitute their judgment for that of an agency head without carefully weighing all the evidence in the arguments presented by both sides.

> On the contrary, if we construct [constrict] the manner in which courts perform this vital review function, we make the classifiers themselves privileged officials, immune from the accountability necessary for Government to function smoothly.

Source Book, *supra* note 28, at 449. *See also id.* at 437–438, 459–460 (remarks of Sen. Kennedy), 466–467 (remarks of Sen. Cranston), 404–406 (remarks of Rep. Moorhead), 413 (remarks of Rep. Reid).

**36.** Source Book, *supra* note 28, at 431–434.

**37.** *Id.* at 480.

gress and President over the 1974 amendments. Both the Nixon and the Ford Administrations urged Congress to replace the *de novo* review applied in other FOIA cases with some lesser degree of scrutiny in cases allegedly involving sensitive national security materials. The major argument made in favor of this special treatment was that judges lack the knowledge and expertise necessary to make decisions about disclosure in such cases.[38] Congress soundly rejected this contention, however, and refused to create a presumption in favor of agency classifications or to retreat from full *de novo* review.[39]

The statutory requirement that review be *de novo* is intended to "prevent it from becoming meaningless judicial sanctioning of agency discretion." S.Rep. No. 813, *supra,* at 8. Congress feared more than "bad faith" in the exercise of agency discretion to withhold government information. Even "good faith" interpretations by an agency are likely to suffer from the bias of the agency, particularly when the agency is as zealous as the CIA has been in its responsibility to protect "national security."[40] Being aware of the dangers of relying too much on agency "expertise," Congress re-

quired the courts to take a fresh look at decisions against disclosure as a check against both intentional misrepresentations and inherent biases.

In order to take the "fresh look" required for *de novo* review, a District Court must not only be aware of the relevant provisions in statutes and Executive orders, but must also know enough about the specific factual situation involved to enable it to decide for itself whether the materials are properly exempt from disclosure. The government, which bears the burden of proving that any exemption applies, can provide the District Court with the information necessary for its *de novo* determination in several ways. The Conference Report, in a passage responding in part to President Ford's objections, suggests that an agency should first be given "the opportunity to establish by means of testimony or detailed affidavits that the documents are *clearly* exempt from disclosure."[41] These methods of supplying the relevant data also comport with the concern of this court in *Vaughn* to get as much information as possible into the public record in order to aid the adversary proc-

**38.** *See* authorities cited in note 28 *supra.*

**39.** When the Senate was considering whether to override the President's veto, Senator Kennedy called attention to the numerous cases in which judges were currently "examining extremely sensitive information and carrying out that judicial review responsibility very well." Source Book, *supra* note 28, at 459. He also quoted the following passages from the Supreme Court's opinion in *United States v. United States District Court,* 407 U.S. 297, 320, 92 S.Ct. 2125, 2138, 32 L.Ed.2d 752 (1972) (the *Keith* case):

We cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation. Courts regularly deal with the most difficult issues of our society. There is no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved in domestic security cases.

This is important:

If the threat is too subtle or complex for our senior law enforcement officers to convey its significance to a court, one may question whether there is probable cause for surveillance.

Source Book, *supra* note 28, at 460. *See also Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 48–50, 516 F.2d 594, 641–643 (1975) (*en banc*), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

The Conference Report did register an "expectation" that agency affidavits would be given "substantial weight." This passage of the Conference Report is discussed in Part I–C–2–b *infra.*

**40.** *See, e. g., Mail Opening: Hearings Before the Senate Select Comm. to Study Governmental Operations With Respect to Intelligence Activities,* 94th Cong., 1st Sess. (1975); *Final Report of the Select Comm. to Study Governmental Operations With Respect to Intelligence Activities,* S.Rep. No. 94–755, 94th Cong., 2d Sess. (1976); *U.S. Intelligence Agencies and Activities: Domestic Intelligence Programs: Hearings Before the House Select Comm. on Intelligence,* 94th Cong., 1st Sess., Part 3 (1975); The Nelson Rockefeller Report to the President by the Commission on CIA Activities 9–10, 20–25, 32–33, 130–159 (June 1975).

**41.** S.Rep. No. 1200, *supra* note 15, at 9 (emphasis added); *see* 190 U.S.App.D.C., at ——, 587 F.2d at 1208, *supra.*

ess.[42] Nevertheless, the Conference Report also recognizes that affidavits and testimony will not always provide the court with sufficient information to make such a "clear" determination—for example, in cases where affidavits sufficient to allow *de novo* review would reveal the very information that the agency claims is exempt, or in cases where the court suspects the agency of bad faith or overzealousness—and that *in camera* inspection will therefore "in many situations * * * plainly be necessary and appropriate." S.Rep. No. 1200, *supra*, at 9.[43]

By expressly endorsing *in camera* examination as a technique in the *de novo* review of *all* claimed exemptions, Congress rejected the various arguments that had been raised against this technique in the hearings and during the debates. The most frequently voiced objection to *in camera* inspection was the familiar argument against *de novo* review mentioned above: that judges lack the knowledge and expertise to evaluate the effects of releasing allegedly sensitive documents. Congress responded to this concern by noting that the reviewing court would have the benefit of the agency's affidavits—possibly including additional *in camera* affidavits "in some cases of a particularly sensitive nature"—when making its *in camera* examination[44] and by expressing its expectation that the reviewing court would accord "substantial weight" to agency affidavits reflecting special knowledge or expertise.[45] Congress steadfastly refused, however, to modify the language of the statute endorsing permissive *in camera* inspection in national security cases because of a fear of judicial incompetence that it considered "unfounded."[46]

Opponents of *in camera* examination also warned that court personnel and procedures presented a high risk of unauthorized leaks. In response to this fear the Senate Report suggested initiation of reasonable precautions, including "limiting access by court personnel to those obtaining appropriate security clearances" or appointing a "special master who may be required by the court to obtain such security clearance as had been previously required for access to the contested documents."[47]

Congress likewise recognized and encouraged the development of flexible responses to eliminate a third objection to *in camera* examination: the potential burden on the courts. The Senate Report approved *Vaughn's* suggestion that special masters be appointed in cases involving numerous documents.[48] Courts have also avoided the

---

42. See text and notes at notes 18–24 *supra*.

43. In order to supply the court with the information necessary for *de novo* review when it fears that public affidavits containing such information would reveal too much, an agency may also provide more detailed affidavits to the court *in camera*. *See Phillippi v. CIA*, 178 U.S.App.D.C. 243, 546 F.2d 1009 (1976); S.Rep. No. 93–854, 93d Cong., 2d Sess., *reprinted in* Source Book, *supra* note 28, at 168. The lack of adversariness in this procedure presents special dangers, however, especially if it is not accompanied by at least some form of *in camera* inspection. In addition, *in camera* affidavits, unlike *in camera* inspection, provide no real check on the accuracy of an agency's representations. It is therefore not surprising that the authorities suggesting use of *in camera* affidavits have always cautioned that the procedure must be reserved for unusual and especially sensitive circumstances. As a check against agency abuse of the *in camera* affidavit procedure, a court should require the agency to explain why the information in its *in camera* submission should not have been included in a public affidavit, and should make available to all parties any portions of the *in camera* affidavits that it determines, after full consideration of the agency's arguments, do not warrant a protective order.

44. S.Rep. No. 93–854, *supra* note 43, *reprinted in* Source Book, *supra* note 28, at 167–168. *See* note 43 *supra*.

45. *See* Part I–C–2–b *infra*.

46. Letter from Senator Edward M. Kennedy and Representative William S. Moorhead, Chairmen of the Conference Committee, to President Gerald R. Ford, Sept. 23, 1974, *reprinted in* Source Book, *supra* note 28, at 381.

47. S.Rep. No. 93–854, *supra* note 43, *reprinted in* Source Book, *supra* note 28, at 168.

48. *Id.* at 167; *see Vaughn v. Rosen, supra* note 7, 157 U.S.App.D.C. at 348, 484 F.2d at 828. *See also Irons v. Gottschalk,* 179 U.S.App.D.C. 37, 42, 548 F.2d 992, 997 (1976).

burden of conducting a "line-by-line" analysis of thousands of pages by requiring indices and detailed affidavits and then examining only random samples of the contested material *in camera* as a check on the general accuracy and adequacy of the agency's analysis.[49]

Finally, *in camera* examination has been criticized because it is conducted *ex parte*, without the benefit of an adversarial proceeding. The Senate Report recognized this deficiency and encouraged such procedures as requiring *Vaughn* indices and affidavits *in addition to in camera* examination and even allowing plaintiffs' counsel to have access to the contested documents *in camera* under special agreement "whenever possible."[50] Notably, the party usually opposing *in camera* inspection is not the plaintiff seeking disclosure, but, as in this case, the agency seeking suppression—even from the court. Since the purpose of *in camera* inspection is to allow the court to determine the facts *de novo* without revealing the requested documents to the plaintiff, as a true adversary proceeding would require, it is difficult to imagine a legitimate reason for the agencies' resistance to this technique that is essentially designed for their benefit. It goes without saying that covering up an agency's "mistakes" is not an acceptable reason for denying disclosure under the FOIA. In any event, where the affidavits and index are available and there is still a dispute of fact concerning the nature or contents of the documents sought to be produced under the FOIA, an *in camera* inspection *increases* the "adversariness" of the proceeding—or at least provides a minimal substitute for true "adversariness" —by allowing the court to test the accuracy of the agency's representations.

Congress' resistance to these objections and its encouragement of flexible responses to overcome them reflect its recognition that the possibility of an *in camera* inspection is "in many situations" essential to *de novo* review and is an indispensable incentive to assure the accuracy of agency affidavits and testimony.[51]

**49.** *See, e.g., Mead Data Central, Inc. v. Department of the Air Force,* 184 U.S.App.D.C. 350, 370 & n.59, 566 F.2d 242, 262 & n.59 (1977); *Ash Grove Cement Co. v. FTC,* 167 U.S.App. D.C. 249, 252, 511 F.2d 815, 818 (1975); *Fensterwald v. CIA,* 443 F.Supp. 667 (D.D.C.1977).

**50.** S.Rep. No. 93–854, *supra* note 43, *reprinted in* Source Book, *supra* note 28, at 166–167. *See also United States v. AT&T, supra* note 24, 185 U.S.App.D.C. at 256, 567 F.2d at 133.

**51.** S.Rep. No. 1200, *supra* note 15, at 9. In this case, for instance, it was only after this suit was brought with the attendant threat of *in camera* inspection that the CIA, which had *twice* before found no segregable portions among the requested materials (JA 17–18, 21–22)—once even flatly stating that no such portions existed (JA 21–22)—eventually discovered that there were indeed segregable portions (*see* JA 27–30, 42–52; *see also* text at notes 7–9 and note 7 *supra*). Furthermore, it was only under the additional specific threat of plaintiff's motion for *in camera* inspection that the Agency submitted the "supplemental affidavit" of Eloise Page, giving more detailed, but still inadequate, descriptions of the items withheld (JA 62–64).

Another recent case also underscores the vital role that the threat of *in camera* inspection can play, perhaps especially with respect to the CIA. In that case, *Goland v. CIA* (D.C.Cir. No. 76–1800, decided May 23, 1978), plaintiffs "requested documents from the [CIA] relating to the legislative history of the Agency's organic statutes, slip op. at 2." Not convinced of the thoroughness with which the Agency had searched for responsive documents, and questioning the Agency's refusal to make available concededly responsive materials, plaintiffs brought suit under the FOIA. The District Court granted summary judgment in favor of the CIA; the opinion of this court affirming the District Court issued on May 23, 1978. One week later, on May 30, 1978, the CIA for the first time disclosed to plaintiffs' counsel and to this court the existence of various other documents that had been determined by the Agency six months earlier to be potentially relevant to the *Goland* case. These documents totaled 321, and were supplied to plaintiffs in June 1978. The CIA thus withheld from the plaintiffs and from the judicial process until after the opinion of the appellate court had issued the existence of over 300 documents of at least potential relevance to the *Goland* case. By so doing the CIA has again amply demonstrated the need for incentives such as *in camera* inspection to ensure compliance with the requirements of the FOIA. Similarly, in *Marks v. CIA* (D.C.Cir. No. 77–1225, decided this day). (slip op. at 1 n.4). (Wright, C. J., concurring and dissenting), the Agency, subsequent to the District Court's opinion and to that court's refusal to conduct an *in camera* inspection of

b. *According "Substantial Weight to an Agency's Affidavit Concerning the Details of the Classified Status of the Disputed Report."*

Although Congress refused to alter the statutory provisions calling for *de novo* review with the burden on the government and permissive *in camera* inspection, the Conference Committee did include language in its report designed to assuage the President's "unfounded"[52] fears without compromising on these fundamental issues. These passages are a legitimate part of the legislative history and should influence the conduct of the courts to the extent that they are compatible with the fundamental directions on the face of the statute itself. One such passage, providing that agencies should be given the chance to prove that requested materials are "clearly exempt" using detailed affidavits or testimony, has already been discussed.[53]

A second passage, located in a portion of the Report referring to Exemption 1, expresses the Committee's recognition that agencies "responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of public disclosure of a particular classified record" and the Committee's expectation "that Federal courts, in making de novo determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." S.Rep. No. 1200, *supra,* at 12. These words responded to the image of uninformed judges recklessly exposing sensitive information—an image cultivated by the opponents of *de novo* review and *in camera* examination.[54] The Conference Committee countered this image by registering its anticipation that rational judges conducting *de novo* reviews would naturally be impressed by any special knowledge, experience, and reasoning demonstrated by agencies with expertise and responsibility in matters of defense and foreign policy. As Senator Muskie remarked:

> As a practical matter, I cannot imagine that any Federal judge would throw open the gates of the Nation's classified secrets, or that they would substitute their judgment for that of an agency head without carefully weighing all the evidence in the arguments presented by both sides.

Source Book, *supra,* at 449. This logical interpretation of the Conference Report passage is perfectly consistent with the actual words of the 1974 amendments.

It is important to recognize the limits, as well as the value, of this language in the Conference Report. Stretching the Conference Committee's recognition of the "substantial weight" deserved by demonstrated expertise and knowledge into a broad presumption favoring all agency affidavits in national security cases would contradict the clear provisions of the statute and would render meaningless Congress' obvious intent in passing these provisions over the President's specific objections. An affidavit explaining in detail the factors about particular material that have convinced the agency that the material should be classified should and will be quite influential with a reviewing court. On the other hand, an affidavit stating only in general or conclusory terms why the agency in its wisdom has determined that the criteria for nondisclosure are met should not and cannot be accorded "substantial weight" in a *de novo* proceeding. To substitute a presumption favoring conclusory agency affidavits for

---

disputed materials, although prior to this court's judgment, released information that previously had been withheld.

Even in a case in which a specific finding of the Agency's good faith had been made, *in camera* inspection resulted in disclosure of additional information, thus emphasizing the difficulties that inhere in permitting an agency to be the final judge of its own cause. *See Halperin v. CIA,* 446 F.Supp. 661, 666–667 (D.D.C. 1978).

**52.** *See* text and note at note 46 *supra.*

**53.** *See* text and notes at notes 41–43 *supra.*

**54.** *See, e. g.,* Source Book, *supra* note 28, at 316–317, 322-323 (remarks of Sen. Hruska); sources cited in notes 28 and 33 *supra.*

the courts' responsibility to make a *de novo* determination *with the burden on the government* would repeal the very aspects of the 1974 amendments that made it necessary for the Congress to override the President's veto.

### 3. *Summary*

Congress has already reversed overly restrictive judicial interpretations of the FOIA twice, *see* Part I–A *supra,* and congressional intent is by now sufficiently clear that a third legislative reversal should not be necessary. In FOIA cases involving exemptions based on national security, as in other FOIA cases, the government bears the burden of proving in a *de novo* proceeding before a court that any material not disclosed comes within one of the statutory exemptions. The government should be given the opportunity to establish by detailed affidavits or testimony that the requested material is clearly exempt from disclosure, and in conducting its *de novo* review in a national security case the court should give substantial weight to the agency's affidavits insofar as they reflect the agency's special knowledge and expertise. However, if the government fails to demonstrate by these means that the material is *clearly* exempt and that no segregable portions remain, or if the court has any suspicion of bad faith on the part of the agency,[55] some form of *in camera* examination will be "necessary and appropriate."

### D. *Outline of the Review Process*

My examination of the provisions and purposes of the FOIA and of the relevant judicial precedents suggests that a District Court reviewing an agency's claim that requested material falls within an exemption should generally proceed as follows:

### 1. *Requirements of Index and Detailed Affidavits*

As outlined in *Vaughn,* the court should require the agency to support its claim of exemption with (1) an index dividing the material into manageable segments and identifying what parts of it are withheld under which exemptions, and (2) detailed affidavits describing the matters withheld and giving any other evidence relevant to the particular exemptions claimed. To enhance the adversary process, the affidavits should be as detailed as possible without revealing the information claimed to be exempt.[56] This requirement may be modified, but only under extreme circumstances.[57]

### 2. *Questions for the Court*

Once the index and affidavits have been submitted, the court must undertake several different types of inquiry.

### a. *The Legal Issues.*

The court must first determine the legal criteria for applying the exemption claimed by the agency. The words of the statute and the relevant precedents establish the kinds of matters that are exempt and any necessary procedural steps that are required for exemption. This aspect of the court's inquiry is fully open and adversarial.

**55.** A court might suspect bad faith if an agency failed to correct deficiencies in its affidavits when given a second chance to be more specific, or if an agency submitted affidavits in the first instance that suffered from defects pointed out in previous court decisions. The District Court, of course, has discretion to employ *in camera* examination whenever it feels a need to check the accuracy of the agency's representations to meet its responsibility in conducting a *de novo* review. *See per curiam,* 190 U.S.App. D.C. at ——, 587 F.2d at 1195.

**56.** A detailed index and affidavits are necessary even if the court conducts an *in camera* examination, since these public explanations of the agency's action give the plaintiff at least some material on which to base its adversary role. Furthermore, these documents provide essential assistance to the court by focusing on the relevant issues and arguments. *See Mead Data Central, Inc. v. Department of the Air Force, supra* note 49, 184 U.S.App.D.C. at 358–359, 372–374, 566 F.2d at 250–251, 260–262; *Vaughn v. Rosen, supra* note 7, 157 U.S.App. D.C. at 345–348, 484 F.2d at 825–828.

**57.** *See, e. g., Phillippi v. CIA, supra* note 43 (affidavits submitted under seal for *in camera* inspection when government alleged that even admission that requested information existed would endanger national security).

### b. *The Factual Issues.*

The court must then determine the facts of the particular case: the nature of the matters withheld and other relevant issues, such as the purposes for which the information was created,[58] whether requisite procedures were followed,[59] and the possible effects of disclosure.[60] Deciding these issues may be difficult because of the absence of normal adversary procedures. The court may rely on affidavits and testimony, whose usefulness is directly related to their detail; discovery, which may be particularly useful in determining whether requisite procedures have been followed; and *in camera* inspection. The court's task will be easiest where the parties stipulate to the relevant facts.[61] Adequately detailed affidavits and opportunities for discovery may encourage such stipulations. When factual issues are disputed, the burden of proof is on the government. If the burden cannot be *clearly* met by detailed affidavits and testimony, or when there is any indication of bad faith on the part of the agency, the court may not, in my view, sustain the agency's action without conducting an *in camera* inspection of the matters withheld. A court may appoint a special master or inspect portions of the record at random when the burden of inspection is significant.

### c. *Application of Law to Facts.*

Finally, the court must decide whether the claimed exemption applies on the facts of the particular case. The statutory language and relevant precedents will often provide a clear answer, but, inevitably, some cases will present ambiguities that must be resolved. When such ambiguity is present courts should be guided by FOIA's emphasis on increasing disclosure and Congress' decision to place the burden on the party withholding information. If the government is unable to establish that the material withheld meets all the legal requirements necessary to qualify for one of the nine statutory exemptions, the material must be released.[62] If the court sustains the agency's refusal to disclose the requested information, it must provide a statement of its conclusions as to the relevant law and facts to assist the plaintiff in deciding whether and on what grounds to appeal the decision and to assist the Court of Appeals if the plaintiff appeals.[63]

With this framework in mind, I now turn to the particular circumstances of this case.

## II.  REVIEW IN THIS CASE

### A.  *Adequacy of Index and Affidavits*

An examination of the record in this case immediately reveals a problem: the CIA's affidavits are ambiguous about what exemptions apply to what portions of the withheld information. The affidavits specify that ten documents are involved, give a brief description of each document, and

---

**58.** This issue may be relevant, for example, in determining whether Exemption 5 applies in a particular case. *See, e. g., Mead Data Central, Inc. v. Department of the Air Force, supra* note 49, 184 U.S.App.D.C. at 360–367, 566 F.2d at 252–259.

**59.** This issue may be relevant in determining whether the conditions of applying Exemption 1 have been met. *See, e. g., Halperin v. Department of State,* 184 U.S.App.D.C. 124, 565 F.2d 699 (1977).

**60.** This issue may be relevant, for example, in determining the application of Exemptions 1, 3, and 6.

**61.** *See, e. g., Baker v. CIA,* 188 U.S.App.D.C. 401, 580 F.2d 664 (1978). *Baker* presents an easy case because the plaintiff's request by its own terms sought only types of information that are specifically exempted from disclosure by a statute that qualifies under Exemption 3.

**62.** *See, e. g., EPA v. Mink, supra* note 11, 410 U.S. at 79, 93 S.Ct. 827; *Getman v. NLRB,* 146 U.S.App.D.C. 209, 216–219, 450 F.2d 670, 677–680 (1971). *But cf. Halperin v. Department of State, supra* note 59, 184 U.S.App.D.C. at 131–132, 565 F.2d at 706–707 (where materials fail to qualify for Exemption 1 because of agency's failure to follow proper procedures and government alleges that disclosure would constitute grave danger to national security, court should examine materials *in camera* to determine whether they may be withheld according to exacting standard employed in First Amendment cases involving prior restraints).

**63.** *See* note 22 *supra.*

enumerate the exemptions pursuant to which each document has been withheld.[64] One affidavit also explains the rationales of the exemptions relied on and describes the general types of materials for which each exemption is claimed.[65] The affidavits do not, however, indicate what portions of each document are allegedly covered by each of the multiple exemptions listed as grounds for nondisclosure. For example, the affidavits assert that Document 2 has been withheld pursuant to Exemptions 1, 3, and 6; but the affidavits fail to specify whether any one of these three exemptions covers the whole document or whether, on the contrary, each exemption covers different parts and all three exemptions are thus necessary to justify withholding the entire document.[66] The Agency's description of the document and its reliance on multiple exemptions based on quite different criteria suggest that the latter situation is more

likely.[67] The same problem infects the Agency's affidavits with respect to at least nine of the ten documents in this case.[68]

This ambiguity as to which exemptions are claimed for which material is one of the very problems that led this court in *Vaughn* to require adequate indexing and detailed affidavits. The value of the *Vaughn* procedures is evident in this case. The ambiguity caused by the CIA's failure adequately to follow *Vaughn* caused the District Court to make an error that requires this court to reverse it. Apparently interpreting the ambiguous affidavit to assert that all the non-disclosed material could be withheld under Exemption 1 alone or under Exemption 3 alone, the District Court upheld the Agency's action on the alternative grounds of "exemption 1 alone, on the basis of exemption 3 alone, or on the basis of the two exemptions coupled together,"[69] without

---

64. *See* Affidavit of Robert S. Young, *supra* note 7, at JA 29–30; Affidavit of Eloise Page, *supra* note 7, at JA 40–41; Supplemental Affidavit of Eloise Page, *supra* note 8, at JA 62–64.

65. Affidavit of Eloise Page, *supra* note 7, at JA 31–39.

66. Document

Number   Statement

\* \* \*  \* \* \*

2   This document is a three-page memorandum the subject of which is "Rennie Davis and Friends." It is essentially the debriefing report of a sensitive intelligence source. The majority of the information concerns individuals other than the plaintiffs.

This document has been denied in its entirety, primarily to protect intelligence sources and methods since the release of any meaningful portion would disclose the identity of the source, and further, to protect cryptonyms, names of CIA personnel and CIA organizational data. Thus exemptions (b)(1), (b)(3) and (b)(6) apply.

Supplemental Affidavit of Eloise Page, *supra* note 8, at JA 62–63.

67. The affidavit states that "[t]he *majority* of the information concerns individuals other than the plaintiffs," *id.* at JA 62 (emphasis added)—suggesting a partial reliance on Exemption 6. It then states that the document was withheld "*primarily* to protect intelligence sources and methods," *id.* at JA 63 (emphasis added)—indicating reliance on Exemption 3 for most, but not necessarily all, of the material. The affidavit does not indicate how much, if any, of the document is covered by Exemption 1.

68. The Agency relied on Exemptions 1, 3, and 6 for Documents 2–9 and on Exemptions 1, 3, 6, and 7(F) for Document 10. The Agency's statements concerning Documents 3–9 are even less enlightening than its statement concerning Document 2. The statement for Documents 3, 4, and 5, for example, reads:

These documents are one-page cables from an overseas CIA installation which advise Headquarters of the receipt of documents and information from a foreign intelligence service and which concern the plaintiffs and other individuals.

They are denied in their entirety pursuant to Freedom of Information Act exemptions (b)(1), (b)(3) and (b)(6).

*Id.* at JA. The Agency released most of Document 1, deleting only "the location of CIA overseas installations, cryptonyms, a pseudonym and CIA organizational data" on the basis of Exemptions 1 and 3. *Id.* at JA 62.

69. *Ray v. Bush, supra* note 9, at JA 67 & n.2. The District Court quoted language from *Phillippi v. CIA, supra* note 43, 178 U.S.App.D.C. at 249–250 & n.14, 546 F.2d at 1015–1016 & n.14, recognizing that the "applicability of [Exemptions 1 and 3] may tend to merge," and from *Weissman v. CIA, supra* note 1, 184 U.S.App. D.C. at 123, 565 F.2d at 698, noting that "exemption (b)(3) alone, or coupled with other exemptions, [could be] sufficient to protect the document from disclosure." Exemptions 1 and 3 may cover similar types of material, but the requirements for operation of each exemption are quite distinct, and neither agencies nor reviewing courts should make the incorrect as-

even reaching Exemptions 6 or 7. The government itself now admits that its own description of Document 10 indicates that it is withholding material to which Exemptions 1 and 3 do not apply.[70] An examination of the affidavits indicates that this same defect is probably also present with respect to Documents 2–9.[71]

### B. *Exemption 1*

As the court's *per curiam* opinion briefly recognizes,[72] the District Court's opinion does not reflect an adequate examination of either the law or the facts relevant to the CIA's claim based on Exemption 1. As a result of congressional amendments designed to override the restrictive holding of the *Mink* case, Exemption 1 now applies only if the District Court determines that (1) the material withheld is properly classifiable under the substantive criteria set forth in the relevant Executive order, and (2) the material has in fact been properly classified according to procedures outlined in the Executive order.[73] The substantive and procedural criteria relevant to this case are established by Executive Order 11652 and a National Security Council directive of May 17, 1972.[74] The threshold substantive

test for determining whether material may be classified under Executive Order 11652 is "whether its unauthorized disclosure could reasonably be expected to cause * * * damage to the national security." Procedural requirements cover such matters as the authority and identification of the original classifier, the proper time for classification, the conspicuous marking of classified material, the identification and segregation of nonclassifiable segments of classified material, and mandatory review and declassification at set time intervals.[75] Failure to comply with proper procedures, just like failure to employ the proper substantive standard, can make Exemption 1 inapplicable. *See Halperin v. Department of State*, 184 U.S.App.D.C. 124, 565 F.2d 699 (1977).

In this case the government submitted affidavits of Eloise Page, Chief of the Operations Staff of the Directorate of Operations of the CIA, who swore that she had "determined that some of these documents, or portions thereof, may not be released because * * * [t]hey are currently properly classified pursuant to the criteria and procedures set forth in Executive Order 11652 * * *." Affidavit of Eloise Page,

---

sumption that using the two exemptions in combination relieves the government's burden of proving that each applies on its own terms to any portion of material for which it is claimed.

**70.** *See* brief for appellee at 17, 19. The CIA's affidavit makes the following statement concerning Document 10:

> This document consists of a one-page memorandum which transmits a copy of a notebook containing a list of names. This list was secured by the United States Customs Service from an individual at a border checkpoint in a search incident to his arrest for importation of narcotics into the United States. The memorandum was provided to the Plaintiff Schaap with only minor deletions (names of CIA employees, organizational data concerning the CIA, name of a United States Customs Agent). Only that portion of the list containing plaintiff's name was provided. Thus exemptions (b)(1), (b)(3), (b)(6) and (b)(7)(F) apply.

Supplemental Affidavit of Eloise Page, *supra* note 8, at JA 63–64.

**71.** The Agency now claims that it did not rely on Exemptions 1 and 3 to withhold the name of the Customs agent and the names of other

individuals in Document 10, brief for appellee at 19, yet it continues to rely on Exemptions 1 and 3 to withhold the names of other individuals and information relating to them contained in other documents, *id.* at 10–19. This distinction, which the government makes in its brief on appeal, is certainly not so clear on the face of the affidavit. *Compare* the statement concerning Document 10, *supra* note 70, *with* the statement concerning Documents 3, 4, and 5, *supra* note 68.

**72.** *Per curiam*, 190 U.S.App.D.C. at ——, ——, 587 F.2d at 1196.

**73.** *See* text at note 15 *supra*.

**74.** *See Halperin v. Department of State, supra* note 59, 184 U.S.App.D.C. at 128–129, 565 F.2d at 703–704.

**75.** *See* Executive Order 11652, 3 C.F.R. 678 (1971–1975 Compilation), *reprinted in* 50 U.S.C. § 401 (Supp. V 1975); National Security Directive of May 17, 1972, 37 Fed.Reg. 10053 (1972).

August 13, 1976, JA 31. After describing in general terms some of the major substantive and procedural requirements for application of Exemption 1, Ms. Page asserted:

> 5. The determination was made by me that, in the case of each document, or portion thereof, which is withheld because it is currently and properly classified, release of that document, or portion thereof, at a minimum, could reasonably be expected to cause damage to the national security. In each case a document determined to contain classified information bears the appropriate markings on its face to evidence its classified status.

*Id.* at 33. On the basis of this statement and some general description of the types of information contained in the documents,[76] the District Court concluded that "[t]he affidavits on file herein clearly show that the documents in question were properly classified under Executive Order 11,652," and sustained the Agency's withholding of all the information on the basis of Exemption 1 alone.[77]

Appellants and *amicus curiae* raise several convincing objections to the District Court's conclusion. First, appellants point out that the affidavits do not indicate that all the material being withheld is exempt under Exemption 1. Ms. Page's affidavit is deliberately ambiguous, stating that the material is being withheld under Exemptions 1 "and or" 3 "and/or" 6 [78]; and the CIA has admitted on appeal that it cannot rely solely on Exemption 1.[79] The District Court's failure to recognize this problem

with the affidavit raises serious doubts about the adequacy of its *de novo* review.

Second, appellants emphasize that summary judgment was granted before any discovery took place. Interrogatories and depositions are especially important in a case where one party has an effective monopoly on the relevant information. Discovery may be particularly useful to appellants in testing whether the procedural requirements of Exemption 1 have been met in this case.[80]

Finally, *amicus* draws attention to the conclusory nature of the affidavit, which often merely parrots the language of the statute or Executive order. According to *amicus*, the CIA has developed "standard form" affidavits to handle cases such as this one. The CIA replies that its standard language reflects the typical nature of FOIA cases, and claims that any more particular descriptions might reveal the very information the Agency seeks to protect. While this concern may explain an agency's failure to produce sufficiently detailed affidavits in a particular case, it does not relieve either the agency or the court of its statutory responsibilities. When an agency cannot get beyond generalities in its affidavits for fear of revealing too much, *de novo* review requires the court to employ additional techniques, such as *in camera* inspection and more detailed *in camera* affidavits.[81]

Faced with the conclusory affidavits produced in this case, appellants requested *in camera* examination, but the District Court

---

**76.** *See* Affidavit of Eloise Page, *supra* note 7, ¶¶ 6–10, at JA 33–35.

**77.** *Ray v. Bush, supra* note 9, at JA 66.

**78.** Affidavit of Eloise Page, *supra* note 7, at JA 31–32.

**79.** *See* text and note at note 70 *supra.*

**80.** *See* text and note at note 75 *supra.* For example, Ms. Page's affidavit states that *she* has determined that each document or portion thereof for which Exemption 1 is claimed meets the substantive criteria of Executive Order 11652 and "bears the appropriate markings." Affidavit of Eloise Page, *supra* note 7, at JA 33. The affidavit does not indicate, however, when this determination was made or whether Ms.

Page was the one who originally classified all the documents.

**81.** The court may in some cases require the agency to submit under protective seal affidavits that are more detailed than those made available to the plaintiff. These affidavits can assist the court in conducting its *in camera* inspection by, for example, pointing out what source or technique would be revealed if the material were disclosed. After its examination the court may order release of any portions of these *in camera* affidavits that it determines will present no danger of unauthorized disclosure. *See Phillippi v. CIA, supra* note 43; notes 43 & 44 *supra.*

denied appellants' motion, citing this court's opinion in *Weissman v. CIA*, 184 U.S.App. D.C. 117, 565 F.2d 692 (1977). The version of the *Weissman* opinion relied on by the District Court was later amended after a motion for rehearing. Order, D.C.Cir. No. 76–1566, April 4, 1977. Passages in the original version that suffered from an excessive deference to agency "expertise" may explain the District Court's unacceptably deferential approach to this case.[82] Today's *per curiam* opinion reaffirms Congress' intent to require independent *de novo* review, *per curiam*, 190 U.S.App.D.C. at ————— ———, 587 F.2d at 1193–1194, and clearly holds that there is no presumption against *in camera* examination in national security cases, *id.*, 190 U.S.App.D.C., at ————— ———, 587 F.2d at 1194–1195, thus reducing the likelihood of excessive deference in this case on remand and in future cases.

### C. *Exemption 3*

The *per curiam* also finds the District Court's approach to Exemption 3 unsatisfactory. *Per curiam,* 190 U.S.App.D.C. at ———, 587 F.2d at 1196. Following its amendment in 1976 to overrule the result in *Robertson*, Exemption 3 applies to matters that are "specifically exempted from disclosure by statute," but only if the exempting statute either leaves no room for agency discretion to determine whether the information is to be disclosed or establishes effective guidelines for agency discretion by specifying "particular criteria for withholding" or "particular types of matters to be withheld." 5 U.S.C. § 552(b)(3) (1976). The 1976 amendment thus removed the *Robertson* loophole by insuring that no agency could rely on an "exempting" statute unless the statute contained clear guidelines upon which a court could rely in reviewing the agency's refusal to disclose requested information.

Proper judicial review of an Exemption 3 claim involves several steps: (1) determining whether the alleged exempting statute qualifies under Exemption 3 as amended, *see American Jewish Congress v. Kreps,* 187 U.S.App.D.C. 413, 574 F.2d 624 (1978), (2) determining what matters the exempting statute covers—what substantive and procedural requirements must be met before it permits nondisclosure, and (3) determining the facts of the particular case and whether the specific information withheld qualifies for nondisclosure under the alleged exempting statute. As with review of other claimed exemptions, the courts must consider each of these questions *de novo*. *See Brandon v. Eckard,* 187 U.S.App.D.C. 28, 32–35, 569 F.2d 683, 687–690 (1977); S.Rep. No. 1200, *supra*, at 8–9.

The CIA's Exemption 3 claim in this case is based on the applicability of 50 U.S.C. §§ 403(d)(3) (directing the Director of the CIA to protect "intelligence sources and methods from unauthorized disclosure") & 403g (exempting the CIA from any law requiring "disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency") (1970). The District Court, following unanimous pre-1976 precedents from this circuit,[83] found that these statutes qualified under the pre-amendment version of Exemption 3, but did not address the effect of the 1976 changes in the FOIA. This court has recently held that these statutes still qualify under the new language because they " 'refer[ ] to particular types of matters to be withheld'—namely, information respecting intelligence sources and methods." *Goland v. CIA,* (D.C.Cir. No. 76–

---

**82.** The original opinion in *Weissman* stated that Congress had recognized the lack of judicial expertise by indicating "that the court was not to substitute its judgment for that of the agency." *Weissman v. CIA, supra* note 1, slip op. at 10 (pre-amendment version). In fact, Congress expressly refused to "indicate" this procedure. *See* text and notes at notes 31–33 *supra*. A more careful scrutiny of the Agency's

claims would have revealed the ambiguities in the affidavits and would have prevented the court from relying exclusively on Exemptions 1 and 3.

**83.** *See, e. g., Weissman v. CIA, supra* note 1, 184 U.S.App.D.C. at 119, 565 F.2d at 694; *Phillippi v. CIA, supra* note 43, 178 U.S.App.D.C. at 249 n.14, 546 F.2d at 1015 n.14.

1800, decided May 23, 1978) (slip op. at 18). Nevertheless, while the "particular types of matters" listed in Section 403g (*e. g.,* names, official titles, salaries) are fairly specific,[84] Section 403(d)(3)'s language of protecting "intelligence sources and methods" is potentially quite expansive. To fulfill Congress' intent to close the loophole created in *Robertson,* courts must be particularly careful when scrutinizing claims of exemptions based on such expansive terms. A court's *de novo* determination that releasing contested material could in fact reasonably be expected to expose intelligence sources or methods is thus essential when an agency seeks to rely on Section 403(d)(3).[85]

Since the District Court's review of the CIA's affidavits in this case was based on the pre-amendment language of Exemption 3, it understandably does not demonstrate the kind of "hard look" necessary to assure adherence to congressional purpose. The District Court's extreme deference to the Agency's interpretation of what constitutes an "intelligence source or method" is evident in such passages as the following:

> Affidavits on file herein state that documents 2 through 9 contain information regarding intelligence sources and methods. There has been no credible challenge to the veracity of these statements and nothing appears to raise the issue of bad faith. The Court therefore concludes that release of this information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and

methods, and that the Agency may rely on exemption 3 and 50 U.S.C. § 403(d)(3) to withhold this information.

*Ray v. Bush,* Civil Action No. 76–0903 (D.D.C. Jan. 25, 1977), at JA 66–67. This is hardly the *de novo* review mandated by Congress, with the *government* having the burden of proof.

The District Court denied appellants' motion for *in camera* inspection with the comment that "[w]ith respect to documents withheld under exemption 3, in camera inspection is seldom, if ever, necessary or appropriate." *Id.* at JA 68. The court apparently based this conclusion on language in cases under the pre-amendment version of Exemption 3 to the effect that in review of an Exemption 3 claim "the only question 'to be determined in a district court's *de novo* inquiry is the factual existence of [a specific statute of the kind described in Exemption 3], regardless of how unwise, self-protective, or inadvertent the enactment might be.' "[86]

This court today definitively rejects this position as inconsistent with the language and legislative history of the FOIA.[87] The 1976 amendments to the language of Exemption 3 provide conclusive support for the court's position. To be sure, a court must abide by *Congress'* statutory decision that certain criteria should govern disclosure and that particular types of information should be exempt. But when courts review an agency's claim of Exemption 3 based on the *agency's* interpretation of

---

**84.** *See Baker v. CIA, supra* note 61, 188 U.S. App.D.C. at 406, 580 F.2d at 669; *Phillippi v. CIA, supra* note 43, 178 U.S.App.D.C. at 249 n.14, 546 F.2d at 1015 n.14.

**85.** The special knowledge and expertise of agencies concerned with defense or foreign policy is equally relevant whether the agency relies on Exemption 1 or on Exemption 3 and a national security statute such as 50 U.S.C. § 403(d)(3). The Conference Committee's "expectation" that federal courts would accord "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record," S. Rep. No. 1200, *supra* note 15, at 12, in their *de novo* review of Exemption 1 claims therefore applies with equal force to *de novo* review of Exemption 3 claims

based on such statutes. Review of such Exemption 3 claims should thus be conducted in accordance with the principles set out above with regard to the "Special Problems in Cases Involving National Security." Part I–C *supra.*

**86.** *Ray v. Bush, supra* note 9, at JA 68, *quoting FAA Administrator v. Robertson,* 422 U.S. 255, 269–270, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975) (Stewart, J., concurring), *quoting in turn EPA v. Mink, supra* note 11, 410 U.S. at 95 n.*, 93 S.Ct. 827 (Stewart, J., concurring). *See also National Airlines v. CAB,* Civil Action No. 75–614 (D.D.C. Oct. 10, 1975).

**87.** *Per curiam,* 190 U.S.App.D.C. at ——, 587 F.2d at 1195.

what Congress has done in a particular statute, they must not only decide whether the statute qualifies under Exemption 3, but also determine the facts of the particular case and decide whether the statute applies to the contested materials under the circumstances. Without *de novo* review of all these issues by the courts, Congress' effort to check agency discretion in the 1976 amendment would be reduced to an impotent formality.[88] The propriety and necessity of *in camera* examination as part of the court's *de novo* review of the relevant factual issues in Exemption 3 cases is therefore essentially the same as in *de novo* review of Exemption 1 cases. *See* Part I–C–2 *supra.*

An effective *de novo* review—using *in camera* inspection of material claimed to reveal "intelligence sources and methods" when appropriate—will achieve the goal Congress intended in amending Exemption 3. Courts will be able to insure that agencies do not impermissibly expand by unreviewed interpretations the "particular types of matters" Congress has exempted from disclosure. Although precedents detailing what *may* be withheld to protect intelligence sources or methods may not be possible, courts will be able to declare in published opinions what is *not* an acceptable interpretation of "protecting intelligence sources and methods." [89]

### D. *Exemptions 6 and 7(F)*

The CIA's affidavit also relied on Exemptions 6 and 7(F) to withhold certain parts of the documents sought by appellants.[90] The Agency relied on Exemption 6, which exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwar-

ranted invasion of personal privacy," to withhold the names of private individuals other than appellants and information relating to such other individuals. Exemption 7(F), which exempts "investigatory records compiled for law enforcement purposes * * * to the extent that the production of such records would * * * endanger the life or physical safety of law enforcement personnel," was used to withhold the name of a United States Customs officer who was the source of one of the ten documents sought.

As mentioned above, the District Court failed to reach these claims because it misinterpreted the Agency's ambiguous affidavit. The court's *per curiam* opinion remands for a more specific affidavit and recognizes that once the Agency has specified which material is allegedly exempt under which exemptions the District Court may well have to consider Exemptions 6 and 7. *Per curiam,* 190 U.S.App.D.C. at ——, 587 F.2d at 1197.

In ruling on an Exemption 6 claim, a court must determine *de novo* (1) whether the material requested falls within the type of matter covered by the exemption, *i. e.,* "personnel and medical files and similar files," *and* (2) whether disclosure would constitute a "clearly unwarranted invasion of personal privacy." Unless the documents in question are indeed "personnel and medical files and similar files," the latter inquiry becomes unnecessary. "Personnel" files, as the Supreme Court wrote in *Department of the Air Force v. Rose, supra,* ordinarily contain information such as "where [an individual] was born, the names of his parents, where he has lived from time to time,

---

88. In *Phillippi v. CIA, supra* note 43, 178 U.S. App.D.C. at 249 n.14, 546 F.2d at 1015 n.14, this court indicated the active role appropriate for a court reviewing an Exemption 3 claim based on § 403(d)(3) when we explained that the exemption would apply only "[i]f the Agency can demonstrate, *see* 5 U.S.C. § 552(a)(4)(B) (Supp. V 1975), that release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods."

89. A court may determine, for example, that the terms "intelligence sources and methods," like the terms "investigative techniques and procedures" in Exemption 7(E), "should not be interpreted to include routine techniques and procedures already well known to the public." H.R.Rep. No. 93–1380, 93d Cong., 2d Sess. 12 (1974).

90. The extent of the CIA's reliance on these exemptions is ambiguous on the face of the Agency's affidavits. *See* text and notes at notes 66–71 *supra.*

his high school or other school records, results of examinations, evaluations of his work performance." 425 U.S. at 377, 96 S.Ct. at 1606. In that case the Court also provided an indication of what is intended by "similar" files, as it held Air Force Academy case summaries "relat[ing] to the discipline of cadet personnel" to be similar to personnel files in the sense intended by Congress in Exemption 6. *Id.* at 376–377, 96 S.Ct. at 1606. Moreover, the Court has stated, also in *Rose*, that it is " 'only the identifying connection to the individual that casts the personnel, medical, and similar files within the protection of [the] sixth exemption.' " *Id.* at 371, 96 S.Ct. at 1604 (*quoting* the District Court in *Rose*). If material is found to fall within the language "personnel and medical files and similar files," the second inquiry required by Exemption 6—whether disclosure would constitute a "clearly unwarranted invasions of personal privacy"—should be undertaken. This inquiry proceeds on a case-by-case basis, balancing the privacy interests of the individual against the public's right to governmental information. *Id.* at 370–382, 96 S.Ct. 1592; *Getman v. NLRB*, 146 U.S.App.D.C. 209, 212–216, 450 F.2d 670, 673–677 (1971).

Consideration of an Exemption 7(F) claim likewise requires a court to determine *de novo* (1) whether the material involved consists of "investigatory records compiled for *law enforcement purposes*" [91] (emphasis added) *and* (2) whether its production would "endanger the life or physical safety of law enforcement personnel." The District Court, of course, has not yet addressed any of these issues. If on remand it finds that both conditions for Exemption 6 or 7(F) are met with regard to any of the material for which these exemptions have been claimed, the District Court must also, as the *per curiam* indicates, *per curiam,* 190 U.S.App. D.C. at ——–——, 587 F.2d at 1197, assure itself that any segregable material is released.

## III. CONCLUSION

Effective *de novo* review by the courts is essential to assure that government agencies comply with Congress' commitment to compel disclosure of information that is being "withheld only to cover up embarrassing mistakes or irregularities * * *." [92] My opinion in this case is an effort to consolidate some of the wisdom of prior cases and the legislative history regarding what courts must do to make *de novo* review a reality. The evolution of the review process must continue; additional creative innovations by counsel, the courts, and Congress are necessary to solve the problems that persist. For the time being, however, the courts can at least see to it that the progress that has already been made is not lost.

---

**91.** As the Supreme Court recently stated, "The thrust of congressional concern in its amendment of Exemption 7 was to make clear that the Exemption did not endlessly protect material simply because it was in an investigatory file." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 230, 98 S.Ct. 2311, 2321, 57 L.Ed.2d 159 (1978). The Court found further in *Robbins Tire & Rubber Co.* that the legislative history indicates "the release of information in investigatory files prior to the completion of *an actual, contemplated enforcement proceeding* was precisely the kind of interference that Congress continued to want to protect against." *Id.* (emphasis added). It seems clear that the CIA, as an intelligence as distinguished from a law enforcement agency, should not, ordinarily at least, be able to avail itself of Exemption 7.

For a discussion of why the CIA, in order to avail itself of Exemption 7, must have acquired the information sought in a lawful national security investigation, *see Marks v. CIA, supra* note 51, slip. op. at 5–16 (Wright, C.J., concurring and dissenting).

**92.** S.Rep. No. 813, *supra* note 10, at 3.